**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CARA TANGRETI** | **CIVIL ACTION No.** |
| **V.** | |
| **SCOTT SEMPLE, JAMES DZURENDA,** | |
| **DAVID MCNEIL, STEPHEN FAUCHER** | |
| **ANTHONY CORCELLA, STEPHEN BATES,** | |
| **CHRISTINE BACHMANN, DOUGLAS ANDREWS** | **AUGUST 22, 2017** |
| **and LT. JOHNSON** | |

**COMPLAINT AND JURY DEMAND**

<u>JURISDICTION</u>

1.      This case is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is

based upon 28 U.S.C. §§ 1331 and 1343.  Supplemental jurisdiction over the state

law claims is conferred by 28 U.S.C. § 1367.

<u>VENUE</u>

2.      Venue is based upon 28 U.S.C. §§ 1391 (b)(1) and (2).  All of the

defendants reside in the District of Connecticut, and all of the acts and omissions

giving rise to the claims herein arose in the District of Connecticut.

## PARTIES

3.      Plaintiff CARA TANGRETI is a citizen of the United States and the State of Connecticut.  She was 27 years old at the time of the sexual abuse described in this Complaint.

4.      Defendants SCOTT SEMPLE and JAMES DZURENDA were, at different times relevant to this Complaint, the Commissioner or Acting Commissioner of the Connecticut Department of Correction (DOC), responsible for the DOC's compliance with the Prison Rape Elimination Act (PREA), PREA implementing regulations, and all other laws concerning sexual abuse and harassment of inmates, and for ensuring the training and supervision of staff at the York Correctional Institution (York C.I.) in Niantic, CT.  They are sued in their individual capacities.

5.      Defendant DAVID McNEIL was at relevant times the DOC's PREA Director/Coordinator, responsible for the DOC's compliance with PREA, PREA implementing regulations, and all other laws concerning sexual abuse and harassment of inmates, and for training DOC staff concerning PREA requirements. He is sued in his individual capacity.

6.      Defendant ANTHONY CORCELLA was at relevant times the DOC's PREA Compliance Manager, responsible for the DOC's compliance with PREA, PREA implementing regulations, and all other laws concerning sexual abuse and harassment of inmates, and for training DOC staff concerning PREA requirements. He is sued in his individual capacity.

7.      Defendant STEPHEN FAUCHER was at relevant times the Warden at York C. I., responsible for York's compliance with PREA, PREA implementing regulations, and all other laws concerning sexual abuse and harassment of inmates, and for training and supervising York C. I. staff concerning PREA requirements.  He is sued in his individual capacity.

8.      Defendant STEPHEN BATES was at relevant times the Deputy Warden of Administration and the PREA Coordinator at York C.I., responsible for York's compliance with PREA, PREA implementing regulations, and all other laws concerning sexual abuse and harassment of inmates, and for training and supervising York C. I. staff.  He is sued in his individual capacity.

9.      Defendant CHRISTINE BACHMANN was at relevant times a Counselor Supervisor at York C.I. and the Unit Manager of the York Davis Building, responsible for York's compliance with PREA, PREA implementing regulations, and all other laws concerning sexual abuse and harassment of inmates.  She is sued in her individual capacity.

10.     Defendant DOUGLAS ANDREWS was at relevant times an Administrative Operational Lieutenant at York C.I., responsible for York's compliance with PREA, PREA implementing regulations, and all other laws concerning sexual abuse and harassment of inmates.  He is sued in his individual capacity.

11.     Defendant JOHNSON was at relevant times a Lieutenant at York C.I., responsible for York's compliance with PREA, PREA implementing regulations, and

all other laws concerning sexual abuse and harassment of inmates.  He is sued in her individual capacity.

## **FACTS**

11.     At all times mentioned herein, each defendant was acting in the course and scope of his or her employment.

12.     At all times mentioned herein, each defendant was acting under color of state law.

13.     From August 2013 to November 2014, CARA TANGRETI was incarcerated on a charge of third degree larceny at York C. I.

14.     Beginning in February 2014, Cara was housed in York's minimum-security Davis Building.

15.     Cara had never been to prison before.

16.     At the time of Cara's incarceration, state and federal law prohibited correctional staff from having any sexual contact whatsoever with inmates.

17.     At the time of Cara's incarceration, state and federal law provided that under no circumstances can an inmate be said to consent or agree to have sex with a correctional officer; and that all such sexual activity is inherently coerced, involuntary and abusive.

18.     In Connecticut, a correctional officer who has sex with an inmate is guilty of felony sexual assault.

19.     It was well established at the time of Cara's incarceration that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation; the Eighth Amendment right of prisoners to be free from sexual abuse was clearly established, and no reasonable prison guard or supervisor could have believed otherwise.

20.     It was also well established at the time of Cara's incarceration that a prison official's deliberate indifference to the risk of sexual abuse by prison employees violates the Eighth Amendment.

21.     The Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15607, passed in 2003, was intended to "increase the accountability of prison officials" and "protect the Eighth Amendment rights of Federal, State, and local prisoners…."

22.     As codified in PREA, 42 U.S.C. § 15601(13), "deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment."

23.     "States that do not take basic steps to abate prison rape by adopting standards that do not generate significant additional expenditures demonstrate such indifference."  42 U.S.C. § 15601.

24.     Effective August 20, 2012, 28 C.F.R. Sec. 115.13, one of PREA's implementing regulations, required the defendants to ensure that York C. I. develop "a staffing plan that provided for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse."

25.    In calculating adequate staffing levels and determining the need for video monitoring, Section 115.13 required the defendants to consider, among other things, "all components of the facility's physical plant (including 'blind spots' or areas where staff or inmates may be isolated)".

26.    Section 115.13 required the defendants, "whenever necessary, but no less frequently than once each year," to assess and determine whether adjustments were needed to the York staffing plan and York's deployment of video monitoring.

27.    The defendants failed and refused to comply with these federal mandates, or to otherwise protect Cara from the known risk of sexual assault and harassment.

28.    The defendants knew that Cara was incarcerated under conditions posing a substantial risk of serious harm; specifically, sexual abuse and harassment by prison employees.

29.    The substantial risk of sexual abuse and harassment was longstanding, pervasive, well-documented, and expressly noted by the defendants.

30.    The defendants also knew that Cara belonged to an identifiable group of inherently vulnerable prisoners – females – who were and are frequently singled out for sexual assaults and abuse.

31.    According to the York C. I. Post Order 6.2.66, effective April 15, 2013 through the time that Cara was sexually abused in the defendants' custody, the "typical" sexual abuse victim will demonstrate the following character traits:

6

vulnerable, non-violent offender, young, small physical stature, first time offender who is not familiar with her environment, feminine in appearance, middle class, and suffering from mental illness.

32.     Cara demonstrated all of these character traits.

33.     Also according to the York C. I. Post Order 6.2.66, the typical sexual predator exhibits the following characteristics: street smart and an experienced fighter, large physical stature, possesses power and authority – feared by most inmates, and experienced in prison culture.

34.     In relation to Cara, the York C. I. guards who abused her demonstrated all of these characteristics.

35.     The guards who abused Cara also demonstrated one or more other characteristics identified by DOC Administrative Directive 6.12 and York C. I. Post Order 6.2.66 as being typical of sexual predators: engages in other criminal activity as well, manipulative, and objectifies women (uses pornography).

36.     Correctional Officer Jeffrey Bromley, at the time he was sexually abusing and assaulting Cara, had been arrested for and convicted of driving while intoxicated.

37.     In 2013, the DOC recorded 39 complaints of sexual abuse and/or sexual harassment at York.

38.     In 2014, the DOC recorded 64 complaints of sexual abuse and/or sexual harassment at York.

39.     The number of recorded complaints at York vastly exceeded – by multiples or many multiples – the number of such complaints at other DOC facilities during those years.

40.     In 2013 more that 30%, and in 2014 more than 37%, of all sexual abuse and harassment complaints made by all inmates at all DOC correctional facilities came from York inmates.

41.     Notwithstanding their actual knowledge of the substantial risk to Cara of sexual abuse and harassment, the defendants acted in conscious disregard of, and with deliberate indifference to, that risk and the plaintiff's safety.

42.     The defendants consciously disregarded the risk to Cara by failing to take reasonable measures – measures that were known to be effective – to abate the harm.

43.     At the time the defendants allowed, encouraged and failed to prevent guards' sexual abuse and harassment of Cara, there were no video surveillance cameras in the York Davis Building.

44.     The lack of cameras in the Davis Building, the facility's lack of compliance with PREA requirements, and the resulting risk to female inmates was known to defendant McNEIL soon after he arrived at the facility in October 2013.

45.     The lack of cameras in the Davis Building, the facility's lack of compliance with PREA requirements, and the resulting risk to female inmates was

8

then, in or around October 2013. made known to all of the other defendants who were not already on actual notice of those facts.

46.    At and before the time the defendants allowed the sexual abuse and harassment of Cara, the defendants and other DOC staff had repeatedly acknowledged and reported the lack of video cameras in the Davis Building, and the facility's ongoing failure to comply with PREA requirements or to otherwise protect female inmates from sexual abuse and harassment.

47.    At and before the time the defendants allowed the sexual abuse and harassment of Cara, each of the individual defendants had actual knowledge of the lack of video cameras and an adequate staffing plan in the Davis Building, and the facility's ongoing failure to comply with PREA requirements; but all of them failed and refused to remedy the DOC's and York's blatant violation of federal law.

48.    At and before the time the defendants allowed the sexual abuse and harassment of Cara, DOC Administrative Directives stated that: "the use of video surveillance cameras shall be used to augment staff tours for increased observation."  The defendants failed and refused to comply and to ensure compliance with that mandate.

49.    At and before the time the defendants allowed the sexual abuse and harassment of Cara, DOC Administrative Directives stated that: "each facility shall identify blind spots where sexual assaults are at higher risk of occurring and develop

a strategy to compensate for such areas."  The defendants failed and refused to comply and to ensure compliance with that mandate.

50.     After learning of York's lack of compliance with federal law and the resulting increased risk of sexual assault and harassment to female inmates, the defendants failed and refused to provide, install or otherwise ensure the acquisition of the mandated cameras.

51.     After learning of York's lack of compliance with federal law and the resulting increased risk of sexual assault and harassment to female inmates, a single grant request was made by defendant McNEIL to a source outside of the DOC and state government for money to purchase the federally-required cameras.

52.     The grant request was either rejected or ignored by the proposed funding source, and no other efforts of any kind were made by any of the defendants to comply with PREA's video surveillance mandate.

53.     Prior to the time Cara was sexually abused and assaulted in blind spots throughout the Davis Building, defendant BACHMANN authored three or four PREA incident reports noting the lack of video cameras and the need for them.

54.     Prior to the time Cara was sexually abused and assaulted in blind spots throughout the Davis Building, York Administrative Captain Alex Smith submitted to defendant FAUCHER another at least three formal requests for video camera coverage in the Davis Building.

55.     In those requests, Smith stated that the facility required the PREA-mandated video surveillance to help ensure the safety and protection of the female inmates, and that the facility was out of compliance with PREA video surveillance requirements.

56.     Other York staff held the same views during the same period of time.

57.     Smith also concluded, prior to the guards' sexual assaults on Cara, that York was out of compliance with PREA staffing plan requirements.

58.     Prior to the time Cara was sexually abused and assaulted in blind spots throughout the Davis Building, York's lack of compliance with PREA-mandated staffing plan requirements was known to all of the defendants.

59.     Prior to the time Cara was sexually abused and assaulted in blind spots throughout the Davis Building, defendant BATES, who was the Deputy Warden of Administration and the PREA Coordinator at York C.I., also wrote a formal written proposal for video surveillance in the Davis Building, and he submitted it to his supervisor, defendant ANDREWS, and then up the chain of command to defendants FAUCHER, SEMPLE and DZURENDA.

60.     BATES made the formal written request for cameras because they were required to bring York into compliance with PREA mandates and because they were required for inmate safety.

61.     Some or all of the incidents that led to DOC staff's multiple reports and complaints about the lack of PREA-mandated video surveillance in the Davis Building involved sexual assaults on inmates by correctional officers.

62.     The various written requests all sought video cameras to cover blind spots in the exact locations where Cara was subsequently sexually abused – including doorways and hallways leading to the Davis Building basement and laundry room.

63.     Smith later testified that, if there had been video surveillance in those locations, more likely than not Cara would not  have been sexually assaulted and abused.

64.     Defendant McNEIL agrees that, if video cameras had been installed at the locations where Cara was sexually assaulted, those assaults would not have happened at those locations or would have been made more difficult.

65.     FAUCHER sent the various camera requests to defendant SEMPLE and/or defendant DZURENDA; but no video cameras were ever provided, and FAUCHER failed to follow up or do anything else to comply with applicable PREA mandates or to protect Cara and the other female inmates from sexual abuse.

66.     The defendants also failed and refused to actively identify and monitor Cara after the abuse began, as required by DOC Administrative Directive 6.12, even though she was exhibiting characteristics of a sexual abuse victim, including "rape trauma syndrome", bulimia, and excessive weight loss.

67.     The defendants were grossly negligent in supervising subordinates who committed the wrongful acts.

68.     As a result of the failure and refusal of the defendants to protect Cara, at least five male Correctional Officers were given free reign to force sexual relations from and/or to sexually harass her.

69.     In the spring of 2014, while Cara was showering in the Davis Building, Correctional Officer Kareem Dawson entered the bathroom, stuck his finger in Cara's vagina, took it out and put it in her mouth.

70.     Dawson returned a few minutes later, and told Cara to bend over so he could look at her body.

71.     Some days later, Dawson ordered Cara to meet him in the basement of the Davis Building, kissed her, fondled her breasts, and stuck his hand down her pants to feel her vagina.  Dawson then pulled his penis out through the zipper of his pants and, while Cara kneeled on the cement floor, grabbed the back of her head and forced her to perform oral sex on him.

72.     On approximately a half dozen other occasions, Dawson brought Cara into the Davis Building correctional officers' office and forcibly groped and kissed her.

73.     On another occasion, Dawson forced Cara to write him a note describing "what she could do with her mouth".

74.     Defendant BACHMANN knew that Officer Dawson behaved inappropriately toward Cara; including putting her back on laundry duty where he could have access to her after BACHMANN had taken Cara off that duty.

75.     BACHMANN failed to report Dawson's misconduct.

76.     BACHMANN also knew that Dawson was sneaking in and out of a fire escape door in the Davis Building, giving him access to blind spots where he could – and where he actually did – sexually abuse Cara.

77.     BACHMANN also noticed, during the time that Dawson worked in the Davis Building, that Cara always woke early, dressed, and appeared to prepare herself for Dawson's arrival at work.

78.     BACHMANN did nothing about this suspicious behavior.

79.     In June or July, 2014, Correctional Officer Jeffrey Bromley vaginally raped Cara.

80.     On another occasion in or about early August 2014, Bromley compelled Cara to give him oral sex in the laundry room of the Davis Building.

81.     On another occasion later in August, in the first floor office of the Davis building, Bromley forced oral sex from Cara and compelled her to submit to him performing oral sex on her.

82.     On September 13, 2014, Bromley told Cara to meet him again in the Davis Building laundry room, told her he was going to put his dick in her mouth for good luck, and forced her to give him oral sex.

83.     On one of the occasions when Bromley forced oral sex from Cara, he filmed it on his cellphone and told Cara he would watch it at home and masturbate to it.

84.     Bromley also forced Cara to watch the video with him on multiple occasions.

85.     On another occasion, in the Davis Building office, Bromley used his cellphone to take nude pictures of Cara's breasts and vagina.

86.     Later in September 2014, again in the Davis Building laundry room, Bromley placed Cara on top of one of the washing machines, pulled her pants down to her ankles, and vaginally raped her.  He did not use a condom.

87.     After he raped Cara, Bromley told her that he wanted to have sex with her again after she was released from prison.

88.     These are but a few of the many many times that Bromley forced himself on Cara and engaged in sexually assaultive, harassing and abusive conduct toward her.

89.     During the time that Bromley was sexually abusing and harassing Cara, Cara told another correctional officer –  Daniel Crowley – about the abuse; but, not only did Crowley fail and refuse to report Bromley's abuse as he was mandated to do, he chose that opportunity to kiss Cara on the mouth.

90.     During the time that Bromley was sexually abusing and harassing Cara, two other correctional officers – Officer Dupont and Officer Brian Daigle – passed

notes between Bromley and his victim, obvious evidence of an inappropriate relationship and prohibited familiarity; neither Dupont nor Daigle reported Bromley's misconduct.

91.     Two other correctional officers – Demond Hastings and Julian Shuman – also knew about Bromley's misconduct and mistreatment of Cara, but neither of them reported it; rather, after the sexual abuse became known to York superiors in October 2014, Hastings and Shuman tried to intimidate Cara into hiding their knowledge and involvement.

92.     In August 2014, Correctional Officer Brian Withington walked into the Davis Building correctional officers' office while Bromley was forcing oral sex from Cara.  Three hours later, he again walked into the office and found Bromley and Cara there with the lights off.  Withington failed and refused to report Bromley's obvious prohibited misconduct.

93.     All of these DOC staff members had a duty and responsibility to report actual or suspected inappropriate intimacy between a correctional officer and an inmate immediately upon learning of it; however, due to the culture of non-compliance and sexual abuse at York, and due to the policies and customs created and/or continued by the defendants, no reports were ever made.

94.     Throughout the period of time that Bromley sexually abused and harassed Cara, defendant BACHMANN witnessed Bromley engage in questionable, inappropriate, and overly familiar behavior with Cara on many occasions.

95.     For example, BACHMANN witnessed: Bromley frequently hanging around Cara when he should have been attending to his duties; Bromley frequently talking with Cara in the Davis Building correctional officers' office, where Cara should not have been; Bromley discussing intimate details of his family life with Cara; Bromley discussing other DOC staff with Cara, which was absolutely forbidden; and Bromley being alone with Cara in the laundry room while all other inmates in the building were confined to their cells.

96.     BACHMANN also had received information from other inmates about Bromley's excessive familiarity with Cara, and specifically about Bromley frequently bringing Cara into the Correctional Officers' office in the Davis Building in the morning before BACHMANN arrived at work.

97.     On at least one occasion, BACHMANN threw Cara out of the office, but did nothing else because, in BACHMANN's view, this was an issue with all of the correctional officers in the Davis Building.

98.     BACHMANN also knew that Bromley brought gifts to Cara, another strictly prohibited activity.

99.     BACHMANN also knew that Bromley joked too often and was too familiar with other inmates, and that he was always walking the line of inappropriateness with the females in his custody.

100.    However, rather than report Bromley's behavior or take other meaningful steps to stop Bromley's inappropriate relationship with Cara,

BACHMANN simply took Bromley aside and told him that what he was doing "didn't look good."

101.    BACHMANN failed and refused to report Bromley being alone with Cara in the laundry room because, in BACHMANN'S words, it was "not that serious an event".

102.    In the fall of 2014, in the midst of his ongoing and obvious sexual abuse and harassment of Cara, Bromley was transferred out of the Davis Building because he was alleged to have sexually touched and harassed yet another inmate.

103.    In September 2014, Correctional Officer Matthew Gillette sexually assaulted Cara on two occasions.

104.    The first time, in the Davis Building laundry room, Gillette said, "let me see what you got back there", turned Cara around to look at her, forcibly kissed her, laid her back on a table, put his penis in her mouth, and forced her to suck on him.

105.    The next day, Gillette told Cara that he wanted to "bend me over and fuck me" and "I want to bend you over and stick it in you for a minute", took her to the same basement of the Davis Building where she had already been sexually assaulted, pulled her pants down, performed oral sex on her, turned her around, bent her over, raped her from behind, and ejaculated inside her.

106.    A few minutes later, when she realized that Gillette had ejaculated inside of her, Cara began to worry that she might get pregnant.  That intense fear and disgust lasted for two months.

107.    Prior to his sexual assaults, Gillette discussed Cara with a fellow Correctional Officer, saying "he would so fuck her" and "she has big tits and a rocking body".  That other officer failed and refused to report Gillette's harassment and objectification of Cara.

108.    Defendant JOHNSON was yet another DOC officer who sexually harassed Cara; he repeatedly asked for personal details about her life, including information that would allow him to find her when she was released from prison, commented on her body, and told her that he wanted to take care of her when she got out.

109.    JOHNSON's sexual harassment and misconduct was especially harmful because he was one of the supervisors responsible for touring the Davis Building and ensuring Cara's safety and the safety of the other female inmates, and was one of the supervisors responsible for accepting and acting on sexual harassment complaints.

110.    Correctional Officers Bromley, Gillette and Dawson were arrested by the Connecticut State Police and charged with sexual assault.  Bromley and Gillette were found guilty of unlawful restraint.  Dawson applied for accelerated rehabilitation, and his criminal file is sealed.

111.    The D.O.C. Security Division/Investigations Unit conducted an investigation into the officers' sexual abuse and harassment of Cara; and, by report

to defendant D.O.C. Commissioner SEMPLE dated April 21, 2016, the Security Division concluded that the allegations are "substantiated."

112.   The Security Division also "recognized that there was a substantial need for video recording capability in the Davis Building that needed to be addressed."

113.   Each of the defendants created policies and customs under which unconstitutional practices occurred, and/or they allowed the continuance of such policies and customs.

114.   All of these correctional officers – Dawson, Bromley, Gillette, Crowley and Johnson – were encouraged and permitted to sexually abuse and harass Cara due to the culture of non-compliance and sexual abuse at York, and due to the policies and customs created and/or continued by the defendants.

115.   At the time of Cara's incarceration, the defendants knew that sexual abuse or sexual harassment of an inmate may cause severe physical and psychological harm and can damage the inmate's chances for a successful integration into law-abiding society.

116.   The sexual abuse and harassment inflicted on Cara, and allowed and encouraged by the defendants, did cause severe physical and psychological harm, including, but not limited to: fear of being impregnated by Gillette; infection with vaginal herpes by one or more of her assaulters; terrifying nightmares; and severe and chronic Post Traumatic Stress Disorder.

## FIRST CLAIM FOR RELIEF

### (8th Amendment Deliberate Indifference to Safety/Failure to Protect)

1. Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1 through116.

2. Each of the defendants was responsible for creating and maintaining policies and practices that allowed, encouraged, and/or failed to prevent the sexual assault and harassment of the plaintiff.

3. Each of the defendants was deliberately indifferent to the substantial risk that Cara would be sexually assaulted and harassed.

4. Each of the defendant's deliberate indifference to the substantial risk of sexual assault and harassment violated Cara's rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment.

## SECOND CLAIM FOR RELIEF

### (State Law Recklessness)

1. Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1 through116.

2. Each of the defendants was consciously aware of the fact that he or she created and/or allowed a substantial risk to Cara.

3.      Notwithstanding each defendant's conscious awareness of the risk to Cara, he or she failed to take necessary and appropriate steps to reduce or eliminate the risk.

4.      Notwithstanding each of the defendant's conscious awareness of the risk to Cara, he or she took affirmative steps to exacerbate the risk and to make harm and injury to Cara more likely.

5.      The reckless or callous indifference, or the wanton misconduct, of each of the defendants, alone and in concert, caused Cara to be sexually assaulted and harassed.

### THIRD CLAIM FOR RELIEF

**(State Law Intentional Infliction of Emotional Distress)**

1.      Plaintiff realleges and incorporates by reference each and every allegation in paragraphs 1 through 116.

2.      Each of the defendants intended to inflict emotional distress or they knew or should have known that emotional distress was the likely result of their acts and/or omissions.

3.      Each of the defendant's conduct was extreme and outrageous.

4.      Each of the defendants' conduct, alone and in concert, caused Cara's distress.

5.    The emotional distress sustained by Cara was and is severe.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff CARA TANGRETI prays for relief as follows:

1.    Compensatory damages according to proof;

2.    State law punitive damages;

3.    Federal law punitive damages;

4.    Costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

and

5.    Such further relief as the Court deems just and proper.


THE PLAINTIFF


By /s/ Antonio Ponvert III
      Antonio Ponvert III
      Federal Bar No. ct 17516
      Koskoff Koskoff & Bieder
      350 Fairfield Avenue
      Bridgeport, Connecticut 06604
      TEL:  203-336-4421
      FAX: 203-368-3244
      Email: aponvert@koskoff.com

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CARA TANGRETI                                    CIVIL ACTION No.

V.

SCOTT SEMPLE, JAMES DZURENDA,
DAVID MCNEIL, STEPHEN FAUCHER
ANTHONY CORCELLA, STEPHEN BATES,
CHRISTINE BACHMANN, DOUGLAS ANDREWS      AUGUST 22, 2017
and LT. JOHNSON

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. Rule 38, the plaintiff in the above-captioned matter

hereby demands a trial by jury on all issues.

THE PLAINTIFF

By /s/ Antonio Ponvert III
    Antonio Ponvert III
    Federal Bar No. ct 17516
    Koskoff Koskoff & Bieder
    350 Fairfield Avenue
    Bridgeport, Connecticut 06604
    TEL:  203-336-4421
    FAX: 203-368-3244
    Email: aponvert@koskoff.com