# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CARA TANGRETI,

    *Plaintiff*,

    v.

SCOTT SEMPLE, DAVID MCNEIL, STEPHEN FAUCHER, ANTHONY CORCELLA, STEVEN BATES, CHRISTINE BACHMANN, DOUGLAS ANDREWS, and MODIKIAH JOHNSON,

    *Defendants*

No. 3:17-cv-01420 (MPS)

October 8, 2019

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In October 2014, when she was an inmate at Connecticut's only women's prison, Cara Tangreti reported that four Department of Corrections ("DOC") officers had sexually assaulted or abused her. After an investigation, the four officers were terminated, and three were criminally prosecuted. In March 2015, Tangreti filed an action, arising from the sexual misconduct, against the State of Connecticut with the Office of the Claims Commissioner, as permitted by Conn. Gen. Stat. § 4-142. In 2017, Tangreti filed this action under 42 U.S.C. § 1983, alleging that eight DOC supervisory employees—ranging from the Commissioner to a counselor supervisor in the building in which the misconduct occurred—violated her Eighth Amendment rights by exhibiting deliberate indifference to the substantial risk of sexual assault and abuse inflicted on her by the four officers; she also alleged state law causes of action for recklessness and intentional infliction of emotional distress. I granted Ms. Tangreti leave to file an amended complaint in October 2018.

After discovery was completed, all eight defendants filed a motion for summary judgment, ECF No. 48, as to all counts of Tangreti's amended complaint, ECF No. 37-1. For the

reasons that follow, Defendants' motion for summary judgment is denied as to the Eighth

Amendment claim against Defendant Bachmann, denied as to the recklessness claim against all

Defendants, and denied as to the intentional infliction of emotional distress claim against

Defendant Johnson. On all other claims, the motion for summary judgment is granted.

## I.     FACTS

The following facts, which are taken primarily from the parties' Local Rule 56(a)

statements and supporting exhibits, are undisputed unless otherwise indicated.

### A.  York Correctional Institution ("York")

York, one of 14 prisons operated by the Connecticut DOC, is the state's only prison for

female offenders. Local Rule 56(a)(1) Statement of Facts ("56(a)(1) Stmt."), ECF No. 60 ¶ 1.

York is composed of numerous buildings, situated on 425 acres. *Id.* ¶ 2. The Davis Building

("Davis"), where the sexual misconduct against Ms. Tangreti occurred, is a stand-alone,

minimum-security building on the east side of the property, with an approximate capacity of 85

inmates. *Id.* ¶ 3. During all shifts each day, there were 3 correctional officers assigned to Davis—

one upstairs, one downstairs, and one "rover." *Id.* ¶ 7. On weekdays from 7:00 AM to 3:00 PM,

there were "numerous counselors and a counselor supervisor" also in Davis. *Id.* Supervisory staff

at York also conducted tours of Davis; the parties dispute the frequency and nature of these

tours. *Id.* ¶ 8. Lieutenant Modikiah Johnson testified that lieutenants toured Davis twice a day:

the "morning tour" took approximately 10 minutes to "walk through the two floors and field any

complaints or issues from the inmates," and the "afternoon tour" took "a couple of minutes" to

"look into the day rooms and speak with the correctional officers about any issues." *Id.* ¶¶ 94–96.

**B. Relevant Employees**

Defendant Scott Semple became the interim Commissioner of the DOC in September 2014 and was officially appointed to that position in March 2015. *Id.* ¶ 28. His office was located at the DOC Central Office in Wethersfield, CT. *Id.* ¶ 29.

Defendant David McNeil was hired as the DOC's first PREA Director in September 2013, *id.* ¶ 53, and remained in that position at all pertinent times, Answer, ECF No. 18 ¶ 5. His office was located at the DOC Central Office in Wethersfield, CT. 56(a)(1) Stmt., ECF No. 60 ¶ 54.

Defendant Stephen Faucher became the Warden of York in December 2012, *id.* ¶ 16, and remained in that position at all pertinent times, Answer, ECF No. 18 ¶ 7.

Defendant Stephen Bates served as the Deputy Warden of Administration at York from December 2013 until September 2016. *Id.* ¶ 100. He also served as the PREA Coordinator at York from January 2014 through February 2015. *Id.* ¶ 101.

Defendant Christine Bachmann was, at all pertinent times, a Counselor Supervisor at York and oversaw the "day-to-day operations of the Marilyn Baker Substance Abuse Program, which is based in the Davis Building." *Id.* ¶ 123; Answer, ECF No. 18 ¶ 9.

Defendant Douglas Andrews was the Administrative Operations Lieutenant at York from January 2014 through May 2015. 56(a)(1) Stmt., ECF No. 60 ¶ 76. His office was located in "York building #6 and it was not part of his responsibilities to tour other buildings" such as Davis. *Id.* ¶ 78.

Defendant Modikiah Johnson worked as a Lieutenant at York from September 2010 through January 2015. *Id.* ¶ 92. His responsibilities included tours of various buildings, including Davis, which he typically toured once a day. *Id.* ¶¶ 93–94.[1]

Correctional Officer Jeffrey Bromley was hired in 1999, *id.* ¶ 68; Correctional Officer Daniel Crowley was hired in 2012, *id.* ¶ 67; Correctional Officer Matthew Gillette was hired in 2010, *id.* ¶ 66; and Correctional Officer Kareem Dawson was hired in 2005, *id.* ¶ 65. All four were terminated from their employment with the DOC following the DOC Security Division Investigation of Ms. Tangreti's allegations. *Id.* ¶¶ 35–36.

### C. Sexual Assaults Against Ms. Tangreti

Ms. Tangreti was incarcerated in York beginning in August 2013. *Id.* ¶ 147. She was initially housed in a building on the West side of the facility but was transferred to Davis on February 27, 2014. *Id.* ¶¶ 148–49.

#### 1. *Assaults by CO Jeffrey Bromley*

Although Ms. Tangreti does not "remember the dates exactly," *see* Tangreti Dep., ECF No. 59-1 at 201, she estimates that the first overtly sexual interaction with CO Bromley occurred in approximately May 2014, when CO Bromley asked her to lift her shirt up, which she did. 56(a)(1) Stmt., ECF No. 60 ¶ 152. After that incident and through approximately September 2014, CO Bromley sexually assaulted Ms. Tangreti numerous times: she performed oral sex on him twice, he performed oral sex on her, and he vaginally raped her on one occasion. *Id.* ¶¶ 152–55; Tangreti Dep., ECF No. 48-16 at 73, 77 (testifying that she "felt uncomfortable saying no to

---

[1] Although Ms. Tangreti's First Amended Complaint also names Anthony Corcella as an eighth Defendant, her opposition to the motion for summary judgment states in a footnote that "[t]he claims against defendant Corcella are withdrawn." Opp'n, ECF No. 58 at 38 n.14. Therefore, I dismiss all claims against Defendant Corcella.

[the sex acts with CO Bromley]. . . . You don't normally say no to a correctional officer"); *see also id.* at 73–76 (describing additional assaults involving kissing, hugging, "him groping me and him putting my hand on his genitals on the outside of his pants," and CO Bromley videotaping Ms. Tangreti performing oral sex on him and then "making [her] watch the video" repeatedly). Many of these assaults occurred in the laundry room, where Ms. Tangreti was assigned to work and where CO Bromley came to meet her every morning at 7:00 AM. 56(a)(1) Stmt., ECF No. 60 ¶ 153. Others occurred in CO Bromley's office. Tangreti Dep., ECF No. 59-1 at 205.

On October 24, 2014, Ms. Tangreti handed CO Crowley a note stating that she was in a relationship with a Correctional Officer. CO Crowley talked to Ms. Tangreti about her note and guessed that she was in a relationship with CO Bromley, but did not report this information to any supervisor and threw away the note. 56(a)(1) Stmt., ECF No. 60 ¶ 165; DOC Security Division Report, ECF No. 59-2 at 118–19 (summarizing interview with CO Crowley). Ms. Tangreti formally reported the sexual assaults by CO Bromley on October 31, 2014, when she was interviewed by Captain Alex Smith—a York Administrative Captain at the time—and Defendant Christine Bachmann. 56(a)(1) Stmt., ECF No. 60 ¶¶ 137, 162; DOC Security Division Report, ECF No. 59-2 at 102–03; Smith Aff., ECF No. 48-15 at 2. Following the DOC Security Division Investigation, CO Bromley was terminated from his employment with the DOC and criminally prosecuted. 56(a)(1) Stmt., ECF No. 60 ¶¶ 35, 37.

### 2. *Assaults by CO Matthew Gillette*

CO Gillette sexually assaulted Ms. Tangreti on two occasions in September 2014. 56(a)(1) Stmt., ECF No. 60 ¶ 167; Tangreti Dep., ECF No. 48-16 at 106. On the first occasion, he kissed her in the laundry room, "pushed" her into a side room and "told [her] to give him oral sex." Tangreti Dep., ECF No. 48-16 at 108; 56(a)(1) Stmt., ECF No. 60 ¶ 168. The next day, in a

closet in the Davis basement, CO Gillette "asked [her] to bend over, [she] pulled [her] pants down like he asked [her] to do, and he had sex with [her]." Tangreti Dep., ECF No. 48-16 at 111. Later that day, "[h]e kissed [her]" in the laundry room." *Id.* at 117. CO Gillette denied these allegations, DOC Security Division Report, ECF No. 59-2 at 113–14, but Defendants admit that "[t]he plaintiff had 2 sexual encounters with CO Gillette in early September of 2014," 56(a)(1) Stmt., ECF No. 60 ¶ 167.

Ms. Tangreti asserts that she told CO Bromley that she had kissed CO Gillette. DOC Security Division Report, ECF No. 59-2 at 103. She officially reported these assaults on October 31, 2014 when she was interviewed by Captain Alex Smith and Defendant Bachmann. *Id.*; 56(a)(1) Stmt., ECF No. 60 ¶ 139. Following the DOC Security Division Investigation, CO Gillete was terminated from his employment with the DOC and criminally prosecuted. 56(a)(1) Stmt., ECF No. 60 ¶¶ 35, 37.

### 3. Assaults by CO Kareem Dawson

Beginning in March 2014, CO Dawson kissed and groped Ms. Tangreti approximately five times in his office. 56(a)(1) Stmt., ECF No. 60 ¶ 173; Tangreti Dep., ECF No. 48-16 at 119–20. Also in approximately March 2014, CO Dawson approached Ms. Tangreti while she was in the shower and digitally penetrated her vagina and her mouth. *Id.* at 121. At CO Dawson's request, Ms. Tangreti also wrote him sexual notes. 56(a)(1) Stmt., ECF No. 60 ¶ 174. On another occasion, CO Dawson forced Ms. Tangreti to give him oral sex in the Davis basement. Tangreti Dep., ECF No. 48-16 at 125–26. CO Dawson denied these allegations, DOC Security Division Report, ECF No. 59-2 at 116, but Defendants admit that "[t]he plaintiff had 2 sexual encounters with CO Dawson: One in the laundry room and one in the basement," 56(a)(1) Stmt., ECF No. 60 ¶ 175).

Following the second assault, Ms. Tangreti told her roommate about the incident. Tangreti Dep., ECF No. 48-16 at 127–28. She officially reported the assaults on October 31, 2014 when she was interviewed by Captain Alex Smith and Defendant Bachmann. 56(a)(1) Stmt., ECF No. 60 ¶ 142; DOC Security Division Report, ECF No. 59-2 at 111–12. Following the DOC Security Division Investigation, CO Dawson was terminated from his employment with the DOC and criminally prosecuted. 56(a)(1) Stmt., ECF No. 60 ¶¶ 35, 37.

### 4. *Assault by CO Daniel Crowley*

As discussed above, Ms. Tangreti wrote a note to CO Crowley on or about October 24, 2014, stating that she was in a relationship with a Correctional Officer. 56(a)(1) Stmt., ECF No. 60 ¶ 165; DOC Security Division Report, ECF No. 59-2 at 118–19. Ms. Tangreti testifies that, as she was about to hand him the letter, CO Crowley "grabbed [her] face and kissed [her]." Tangreti Dep., ECF No. 48-16 at 99. CO Crowley denied this allegation. DOC Security Division Report, ECF No. 59-2 at 119. Ms. Tangreti officially reported the assault by CO Crowley on October 31, 2014, when she was interviewed by Captain Alex Smith and Defendant Bachmann. *Id.* at 104. Following the DOC Security Division Investigation, CO Crowley was terminated from his employment with the DOC. 56(a)(1) Stmt., ECF No. 60 ¶ 36.

### D. PREA Investigations

Congress passed the Prison Rape Elimination Act, 42 U.S.C. §§ 15601 *et seq.* ("PREA"), in 2003. The Department of Justice then issued rules, effective August 20, 2012, "adopting national standards to prevent, detect, and respond to prison rape, as required by the Prison Rape Elimination Act of 2003." 77 Fed. Reg. 37105 (June 20, 2012) (codified at 28 C.F.R. § 115); Answer, ECF No. 18 ¶ 25.

In June 2013, the DOC created a PREA unit. 56(a)(1) Stmt, ECF No. 60 ¶ 52. After that point, PREA investigations were conducted either by the PREA unit or by the DOC Security Division. *Id.* ¶ 102. Deputy Warden Bates, York's PREA Coordinator from January 2014 through February 2015, "would not be involved in the actual investigations, but he would ensure that the investigations were assigned, conducted and completed." *Id.* ¶ 102.

### E. Prior Incidents of Sexual Misconduct at York

From 2009 to 2012, there were no "substantiated incidents" of "sexual contact between staff and inmates" at York. *Id.* ¶ 72, 75. Between June 2010 and October 2014, there were 27 total allegations of PREA-related misconduct[2] against DOC staff at York: the PREA Investigations Unit handled 7 investigations, and the DOC Security Division handled 19. *Id.* ¶¶ 69–70. The PREA Investigations Unit substantiated 3 of the 7 allegations it investigated. *Id.* ¶ 70. One case involved a "York maintenance officer having a physical relationship with a former inmate, who had been released on parole," and the other two involved sexual correspondence between an inmate and a correctional officer. *Id.* All three officers resigned or were removed from state service following these investigations. *Id.* The Security Division substantiated one case involving a correctional officer who had a sexual phone conversation with an inmate. *Id.* ¶ 69. The officer resigned prior to implementation of any employment penalty. *Id.*

CO Gillette was the subject of one other complaint in September 2014, which alleged "undue familiarity between CO Gillette and an inmate," who was not Ms. Tangreti. *Id.* ¶ 66. That investigation was "closed, without a finding" because CO Gillette was soon thereafter arrested and terminated in response to Ms. Tangreti's complaint. *Id.*

_____

[2] Although the PREA was not adopted until 2013, I use the term "PREA-related misconduct" to refer to sexual misconduct in prisons.

CO Bromley was the subject of two other PREA-related complaints. A 2013 complaint by a male inmate alleged sexual harassment; following investigation, "that complaint was found to be unsubstantiated." *Id.* ¶ 68. On October 2, 2014, a complaint was raised regarding "possible undue familiarity between CO Bromley [and] an inmate," who was not Ms. Tangreti. *Id.* That investigation was "closed, without a finding" because CO Bromley was soon thereafter arrested and terminated in response to Ms. Tangreti's complaints. *Id.*

Documents produced in discovery show two additional prior incidents not mentioned in the Local Rule 56(a)(1) Statement. On November 19, 2013, York investigated and substantiated allegations that one inmate "grabbed and pinched [another inmate's] right breast in the hallway of the Davis Building." Post-Investigation Facility Review, ECF No. 59-3 at 10–11. On January 23, 2014, York investigated and substantiated allegations of an inmate and a CO "engaging in [s]exually harassing activities" within a "housing common area and cell" in a York building. Post-Investigation Facility Review, ECF No. 59-3 at 16–17.

### F. Video Surveillance at York

Since at least 2007, York has utilized video cameras for surveillance in some but not all parts of its buildings. *Id.* ¶ 114. Up until at least October 31, 2014, there were no video cameras in Davis. DOC Incident Report, ECF No. 59-2 at 68.

In 2014, David McNeil, PREA Director for the DOC, was "involved in a DOC grant request for federal funds to cover a number of PREA-related items, including video cameras at some of the buildings at York. That grant was not approved." *Id.* ¶ 64.

York itself also requested video cameras from the DOC in 2014. To receive "authorization, funding, and installation" of video cameras in the DOC, a "requesting facility initially submits a proposal, which is then forwarded 'up the chain of command' and ultimately

to the supervisors at the DOC Central Office, who evaluate and act on the proposal, and then to the DOC Facilities and Construction Departments for funding." 56(a)(1) Stmt., ECF No. 60 ¶ 19. "On January 29, 2014, Warden Faucher requested that his staff at York prepare a camera proposal for the installation of surveillance cameras" in Davis and another building. *Id.* ¶ 20. This January 2014 request was the "first camera proposal" that Warden Faucher "was involved with during his tenure at York." *Id.* ¶ 23. His staff, including Lieutenant Douglas Andrews, prepared a camera plan proposal on February 19, 2014 and a "supplemental proposal for the installation of video cameras at two additional York buildings" on May 9, 2014. *Id.* ¶¶ 24–25. These proposals were combined, signed by Warden Faucher on July 2, 2014, and submitted "up the chain of command" in DOC. *Id.* ¶¶ 25–26. The estimated cost for the project was $450,000. *Id.* ¶ 41. Lieutenant Andrews had no further involvement in the request process after preparing the proposal, *id.* ¶ 83; Warden Faucher had no further involvement in the approval process after signing the proposal, *id.* ¶ 27. Deputy Warden Bates was "involved in the proposal, early in 2014," but had no further involvement in the process after that point. *Id.* ¶¶ 106–07.

Commissioner Semple approved the camera plan proposal on August 14, 2014, while he held the position of Deputy Commissioner, but had no further involvement after that point. *Id.* ¶¶ 42–43. Deputy Commissioner Cepelak, "who approves all DOC project requests," approved the camera plan proposal on October 8, 2014. *Id.* ¶ 47. Stephen Link, DOC Director of Facilities, then approved the request on October 20, requested approval from the Department of Construction Services on October 21, and received approval from that department on October 27. *Id.* ¶¶ 48–49. However, York did not secure funding for the project at that time; Director Link states that the "project, along with others, was put on hold because of a budget shortfall memorandum received by State Budget Secretary Ben Barnes" on November 12, 2014. *Id.* ¶ 50;

*see also* Barnes Memorandum, ECF No. 48-14 at 9 (asking all state agency heads to "review your agency's planned spending in order to eliminate, minimize or delay those expenditures that are not absolutely critical in nature," including spending on "contractual services and purchased commodities").

York resubmitted its camera plan proposal to the DOC on April 22, 2015, received approval on April 24, and installed the cameras "shortly thereafter." 56(a)(1) Stmt., ECF No. 60 ¶ 51.

Larry Clymer, an Electrical Design Engineer for the DOC, states that in November 2013, York had a "ratio of .18 cameras per inmate." *Id.* ¶ 118; *see also id.* ¶¶ 119–21 (noting ratios of .05 and .03 at "similar-type facility[ies] to York" and an average ratio of .138 for all non-maximum-security DOC facilities). Ms. Tangreti disputes whether Mr. Clymer is "competent" within the meaning of Local Rule 56(a)(3) to testify to the size of these inmate populations. *Id.*

## II.     SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id.* at 657 (quotation marks omitted). On summary judgment a court "must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). If the moving party carries its burden of demonstrating that there is no genuine issue of material fact, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If "the burden of persuasion at

trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017).

## III. DISCUSSION

### A. Eighth Amendment Violations (Count One)

In Count One of her First Amended Complaint, Ms. Tangreti alleges that each of the Defendants violated her rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment by exhibitng "deliberate indifference to the substantial risk of sexual assault and harassment." ECF No. 37-1 at 20. The Eighth Amendment imposes an affirmative duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prove a claim "based on a failure to prevent harm," the plaintiff must show (1) "that [s]he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the defendants' state of mind was "one of deliberate indifference to inmate health or safety." *Id.* at 834. The second element, "deliberate indifference[,] describes a state of mind more blameworthy than negligence," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. To be deliberately indifferent, the defendant prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Nonetheless, "prison officials who actually knew of a substantial risk to

inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. . . . [P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 844–45.

To recover damages in a §1983 suit, plaintiffs also must show the "personal involvement of [the] defendants in [the] alleged constitutional deprivation[]." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *see also Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir.1999) (explaining that the doctrine of *respondeat superior* is inapplicable to §1983 cases). In the Second Circuit, that personal involvement may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation[;]
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;]
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;]
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[3] The plaintiff must also show an "affirmative causal link" between the personal involvement of the defendant and the plaintiff's constitutional injury. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

---

[3] Defendants argue that the "continued viability of some of the categories for supervisory liability" is in doubt after the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Defs.' Mem., ECF No. 54-1 at 14. In *Iqbal*, the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminary purpose amounts to the supervisor's violating the Constitution" in a § 1983 or *Bivens* action alleging racial discrimination. 556 U.S. at 677. Some courts in this Circuit have questioned *Iqbal*'s impact on the application of the *Colon* categories. *E.g. Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (In a § 1983 case based on alleged gender discrimination, the court noted that "[w]e have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after *Iqbal*" but declined to decide the question.); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (In a § 1983 suit challenging jail conditions, the court noted that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement *with respect to certain constitutional violations*," but declined to "reach *Iqbal*'s impact on *Colon*.")

Defendants argue that "none of the legal theories set forth in *Colon* support the personal involvement of the named defendants." Defs.' Mem., ECF No. 54-1 at 14. Further, they argue that Ms. Tangreti has not satisfied either element of an Eighth Amendment claim, showing neither a substantial risk of serious harm nor deliberate indifference. *Id.* at 33. Finally, and in the alternative, Defendants assert that they are entitled to qualified immunity. *Id.* at 37. In the context of an Eighth Amendment claim, the qualified immunity defense "requires a two-step inquiry. First, we must consider whether the plaintiff's factual allegations . . . show the [official's] conduct violated a constitutional or statutory right." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (alteration in original). If a violation can be shown, "the next, sequential

_____

(emphasis added); *Zappulla v. Fischer*, No. 11 CIV. 6733 JMF, 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013) (collecting district court cases "with some courts concluding *Colon* is no longer good law and others holding that *Colon* continues to apply at least where the alleged constitutional claim does not involve a discriminatory intent element").

    While there is no definitive answer from the Second Circuit on this issue, two recent decisions apply all five *Colon* categories to § 1983 cases without any mention of *Iqbal*. *See Brandon v. Kinter*, No. 17-911-cv, 2019 WL 4263361, at *10 (2d Cir. Sept. 10, 2019) (applying *Colon* categories in § 1983 case based on First Amendment violations); *Delee v. Hannigan*, 729 F. App'x 25, 31 (2d Cir. 2018) (applying *Colon* categories in § 1983 case based on Eighth Amendment and other constitutional violations). Moreover the weight of the caselaw suggests that the *Colon* categories still apply outside the context of intentional discrimination, and thus apply to this Eighth Amendment case. *See Zappulla*, 2013 WL 1387033, at *9 (collecting cases); *Plunkett v. City of New York*, No. 10-CV-6778 CM, 2011 WL 4000985, at *8 (S.D.N.Y. Sept. 2, 2011) (collecting cases that have "routinely continued to cite all five of the Colon categories as the bases for establishing supervisory liability in cases alleging violations of a plaintiff's Fourth and Eighth Amendment rights"). I agree that *Iqbal* addressed supervisory liability specifically in the context of intentional discrimination and therefore does not affect the *Colon* categories in cases "[w]here the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments." *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009). "The *Iqbal* Court specifically noted that '[t]he factors necessary to establish a [constitutional] violation will vary with the constitutional provision at issue.'" *Zappulla*, 2013 WL 1387033, at *9 (quoting *Iqbal*, 556 at 676). For these reasons, I find that, "[u]nless and until the Supreme Court or Second Circuit rule otherwise," the *Colon* categories apply to a case, like this one, alleging Eighth Amendment violations. *Zappulla*, 2013 WL 1387033, at *9.

step is to ask whether the right was clearly established, and, if it was, whether . . . no rational jury could fail to conclude that it was objectively reasonable for the defendant [] to believe that [he was] acting in a fashion that did not violate a clearly established right." *Id.* (alterations in original). Put another way, if the rights at issue were clearly established, "the question of qualified immunity turns on whether it was objectively reasonable for Defendants to believe that their conduct did not violate [the plaintiff's] rights." *Parks v. Blanchette*, 144 F. Supp. 3d 282, 300 (D. Conn. 2015).

I turn first to the question whether Ms. Tangreti faced a substantial risk of serious harm and then address the state of mind and personal involvement of each Defendant, along with the qualified immunity defense.

### 1. *Substantial Risk of Serious Harm*

As noted above, the first element of an Eighth Amendment claim based on failure to prevent harm requires a plaintiff to show "that [s]he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The law in this Circuit is clear that "severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). The Second Circuit clarified in *Crawford v. Cuomo* that "a single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights" and that "[l]ess severe but repetitive conduct may still be 'cumulatively egregious' enough to violate the Constitution." 796 F.3d 252, 257 (2d Cir. 2015).

In this case, the sexual abuse of Ms. Tangreti was both severe and repetitive. In their Local Rule 56(a)(1) Statement, the Defendants admit that CO Bromley and Ms. Tangreti engaged in "oral sex" and "sexual intercourse," ECF No. 60 ¶¶ 153–55; that CO Gillette "asked

her to perform oral sex on him, which she did" and that the two engaged in "sex acts" on another occasion, *id.* ¶¶ 168, 172; and that CO Dawson and Ms. Tangreti had "2 sexual encounters . . . One in the laundry room and one in the basement," *id.* ¶ 175. Under Connecticut law, each of these incidents constituted criminal sexual assault. *See* Conn. Gen. Stat. § 53a-71(a)(5) ("A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and . . . such other person is in the custody of law or detained . . . and the actor has supervisory or disciplinary authority over such other person."); § 53a-65 ("'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. . . . Penetration may be committed by an object manipulated by the actor."); *see also Cash v. Cty. of Erie*, 654 F.3d 324, 337 (2d Cir. 2011) ("[New York] law draws no distinction between assaultive and non-assaultive sexual activity in the prison context; it tolerates neither . . . [,] Defendants were thus obligated to do the same in carrying out their affirmative duty to protect prisoners from harm" (footnote omitted)). Moreover, Ms. Tangreti's testimony suffices at this stage of the litigation to raise, at the very least, a reasonable inference that these sexual incidents were assaultive and nonconsensual. *See* Tangreti Dep., ECF No. 48-16 at 73 ("I didn't feel comfortable saying no" to CO Bromley.); *id.* at 77 ("I felt uncomfortable saying no to [the sex acts with CO Bromley]. . . . You don't normally say no to a correctional officer."); *id.* at 109 ("I felt like I was obligated to do it [with CO Gillette]. They tell you what to do and if you don't abide by their rules, you get in trouble."); *id.* at 113–14 ("I didn't want it to happen" with CO Gillette.); *id.* at 122 ("I wouldn't say I participated" with CO Dawson. "I didn't say no, I was scared of what he was doing. . . . I mean, what am I going to do? This man who has got power over me . . . ."); *id.* at 125–26 ("It was extremely painful what [CO Dawson] was doing. . . . I didn't want to participate in it.").

Defendants blur this initial element of a constitutional deprivation with the issues of Defendants' state of mind and personal involvement. Ms. Tangreti's theory of supervisory liability is that the Defendants failed to prevent sexual abuse through their deliberate indifference to the substantial risk of that abuse. FAC, ECF No. 37-1 at 20; Opp'n, ECF No. 58 at 23–32. Therefore, the relevant question under this first element is not whether the Defendants "created an objectively serious condition by being dilatory in installing video surveillance cameras at the Davis building," Defs.' Mem., ECF No. 54-1 at 34, but whether the sexual conduct Ms. Tangreti experienced was "objectively harmful enough or sufficiently serious to reach constitutional dimensions." *Crawford*, 796 F.3d at 256. Cases in this Circuit have found that sexual abuse less severe than the abuse in this case can constitute an Eighth Amendment violation. *See Crawford*, 796 F.3d at 255, 258 (finding that allegations that a correctional officer "fondle[d] and squeeze[d]" an inmate's penis on one occasion could support a claim for an Eighth Amendment violation since such conduct was "unquestionably repugnant to the conscience of mankind"); *Pusepa v. Annucci*, No. 17-CV-1765 (RA), 2019 WL 690678, at *4 (S.D.N.Y. Feb. 19, 2019) (finding that allegations of an inmate's "illicit relationship" with a correctional officer, including only one incident of physical "sexual contact," could support a claim of failure to prevent sexual abuse in violation of the Eighth Amendment, provided the supervisor defendants had personal involvement under *Colon*, and noting that "[w]hether Plaintiff considered her sexual contact with [the CO] to be consensual is immaterial"); *Qasem v. Toro*, 737 F. Supp. 2d 147, 153 (S.D.N.Y. 2010) (stating that "[i]t is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation" and collecting cases from other Circuits). In this case, a reasonable juror could easily conclude that the conditions of Ms. Tangreti's confinement—involving multiple sexual incidents that both state law and Ms. Tangreti describe

as sexual assault—were "objectively, sufficiently serious" to constitute an Eighth Amendment violation.

### 2. Deliberate Indifference and Personal Involvement

The more difficult questions in this case relate to the second element under *Farmer*—whether Defendants acted with "deliberate indifference to inmate health or safety"—and to the requirements of personal involvement and affirmative causation. *Farmer*, 511 U.S. at 834; *Poe*, 282 F.3d at 140. To show deliberate indifference, a plaintiff must show that the defendant "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. The *Farmer* Court noted that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842 ("For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.") (internal quotation marks omitted). In addition to deliberate indifference, § 1983 plaintiffs must show personal involvement through evidence that:

> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). The plaintiff must also show an "affirmative causal link" between the personal involvement of the defendant and the plaintiff's constitutional injury. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

Defendants argue that they "did not have actual knowledge of any risk to the plaintiff," Defs.' Mem., ECF No. 54-1 at 36, that "none of the legal theories set forth in *Colon* support the personal involvement of the named defendants," *id.* at 14, and that Ms. Tangreti has failed to "demonstrate an affirmative causal link between the actions of the supervisory official, and an injury to the plaintiff," *id.* I will discuss the evidence regarding each Defendant's personal involvement and state of mind in turn.

### a. Commissioner Scott Semple

Ms. Tangreti argues that all defendants "are personally involved in the Eighth Amendment violation under all but the first *Colon* factor," but does not provide specific arguments as to how any of the *Colon* categories apply to any Defendant. Opp'n, ECF No. 58 at 38. The evidence she presents suggests that only the third *Colon* category—"creat[ing] a policy or custom under which unconstitutional practices occurred, or allow[ing] the continuance of such a policy or custom"—is even potentially applicable to Commissioner Semple, due to his alleged failure to remedy the lack of cameras in Davis. In the prison context, courts have found supervisory liability for allowing the continuance of risky policies. *See, e.g.*, *Qasem v. Toro*, 737 F. Supp. 2d 147, 152 (S.D.N.Y. 2010) (finding that plaintiff stated a claim against a prison Superintendent and Deputy Superintendent for "creating and maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted" by a correctional officer).

The other *Colon* categories are inapplicable because Semple was not responsible for supervising the offending COs, and he did respond to the two reports of sexual misconduct Ms.

Tangreti shows he received.[4] The second *Colon* category ("after being informed of the violation through a report or appeal, failed to remedy the wrong") in inapplicable to any of the Defendants; after they were informed of "*the* violation" against Ms. Tangreti on October 31, 2014, all Defendants took actions in response, and Ms. Tangreti does not allege that the Defendants' conduct after October 31, 2014 was improper.[5]

In her summary judgment papers, Ms. Tangreti argues that Semple was on "actual notice of the [Davis] Building's deficiencies" regarding video monitoring. Opp'n, ECF No. 58 at 32. Specifically, Semple signed a project request on August 14, 2014 requesting additional cameras in Davis. 56(a)(1) Stmt., ECF No. 60 ¶ 42; Project Request, ECF No. 59-2 at 97. The request states that "cameras would augment staff tours and identify with observates [sic] blind spots where sexual assaults are at high risk. It would also bring into complianc[e] all standards regarding the Prison Rape Elimination Act (PREA)." Project Request, ECF No. 59-2 at 97. This evidence suggests that Semple was on notice by August 14, 2014 that Davis contained several "blind spots where sexual assaults are at high risk."

However, Ms. Tangreti has not adduced evidence that Semple "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Rather, Semple approved the request, allowing the "DOC engineering department" and the "DOC fiscal department" to determine the logistics of funding and implementation. Semple Aff., ECF No. 48-

---

[4] To the extent that the existence of a substantial risk of serious harm is itself an "unconstitutional act[]", Ms. Tangreti could argue that the fifth *Colon* category—"failing to act on information indicating that unconstitutional acts were occurring"—applies as well. My analysis of Commissioner's Semple's liability would be the same under this category as under the third category.

[5] Even if the "violation" is considered to be the Defendant's knowledge of a substantial risk of serious harm—before any harm occurs—the analysis in this ruling shows that none of the Defendants except Counselor Bachmann could be liable on such a theory.

9 ¶ 31. There is some evidence that Semple may have delayed signing the approval up to one month after receiving it: a handwritten note on a different document suggests that the project request was sent to "To Semple, 7/15/14." Email to Faucher, ECF No. 59-2 at 100. Semple could not recall when he received the request. Semple Dep., ECF No. 59-1 at 96. Even if Semple did delay signing the request for a month, Ms. Tangreti has not provided evidence that such a delay was unreasonable, nor has she provided evidence of a causal link between that delay and her injuries. She has not shown that the process of approving a facility's $450,000 project request or the Commissioner's role in that process ordinarily would or reasonably could move more quickly. Plus, Semple's approval of the project request was not the final step in the process: after he signed the approval, "the project [was] sent to the DOC facilities department for additional approvals (such as Department of Construction Services) and to attempt to secure funding for the project." 56(a)(1) Stmt., ECF No. 60 ¶ 46. Indeed, even after Semple approved the request in August 2014 and two other DOC staff members approved the project in October 2014, "[t]his project, along with others, was put on hold because of a budget shortfall memorandum issued by State Budget Secretary Ben Barnes, on 11/12/14," and was not ultimately approved and effected until late April 2015. *Id.* ¶¶ 50–51. Ms. Tangreti does not present any evidence that cameras would have been installed any earlier had Semple approved the project in July rather than August 2014, let alone early enough to prevent any of the sexual assaults against her.

The only other allegation of Semple's personal involvement is that he knew of another complaint against CO Gillette. After an inmate (not Ms. Tangreti) reported allegations of sexual abuse by CO Gillette on September 20, 2014, Semple "authorized a Security Division investigation into allegations of undue familiarity" on September 25, 2014. *Id.* ¶ 66; DOC Security Division Report, ECF No. 59-3 at 2–3 (reporting digital penetration and groping, among

other sexual misconduct). While these allegations would very likely put Semple and other supervisors on notice that CO Gillette posed a substantial risk to other inmates, Ms. Tangreti does not assert that Semple failed to respond reasonably to this report, or that any of Semple's acts or omissions were a causal factor in Ms. Tangreti's sexual abuse. Indeed, though Ms. Tangreti cannot recall the exact date of her sexual assaults by CO Gillette, the evidence suggests the assaults occurred before the report by the other inmate on September 20, 2014: Ms. Tangreti stated in her interview that the assaults occurred "a couple days" before she was "supposed to be released on parole, which was September 13, 2014." DOC Security Division Report, ECF No. 59-2 at 109. Sadly, by the time Commissioner Semple learned of the other allegation, CO Gillette had already sexually assaulted Ms. Tangreti.

Semple also authorized a Security Division Investigation into "allegations of undue familiarity" involving CO Bromley and another inmate (not Ms. Tangreti) on October 22, 2014. DOC Security Division Report, ECF No. 59-3 at 26. Similarly, while this put Commissioner Semple on notice that CO Bromley posed a risk, it did so too late to enable him to take any steps that would have prevented Bromley's sexual assaults of Ms. Tangreti, which had ceased (at the latest) by October 2, 2014.[6]

---

[6] Ms. Tangreti cannot recall the precise date of the last sexual assault by CO Bromley. In her deposition, she stated that "to [her] recollection [approximately September 13] would be the last sexual incident that [she] can recall." Tangreti Dep., ECF No. 48-16 at 79. Later in the deposition she testified that the sexual abuse continued until Bromley was reassigned to a different building on October 2, 2014. *Id.* at 92–93 ("[I]f he was in the building, this was happening to me."). CO Bromley was placed on "No Inmate Contact" ("NIC") on October 2, 2014, following an allegation by another inmate. DOC Security Division Report, ECF No. 59-2 at 113. There is no evidence to suggest that CO Bromley abused Ms. Tangreti after October 2, 2014, and Ms. Tangreti stated she had no in-person contact with CO Bromley after he was "moved out of Davis" on October 2. Tangreti Dep., ECF No. 48-16 at 94–95.

Ms. Tangreti does not point to any other evidence of Semple's personal involvement in the constitutional violation. She presents no evidence that he was involved in supervising any of the four officers who assaulted or otherwise engaged in misconduct with Ms. Tangreti or that he was grossly negligent in supervising any of his staff. *See Colon*, 58 F.3d at 873. Therefore, to the extent Semple was personally involved in the camera plan proposal or was on notice of any deficiency in York's video monitoring, Ms. Tangreti has not shown that he failed to take reasonable measures to address the risk of sexual assault, or that any such failures caused the harm she suffered. Therefore, I grant summary judgment with respect to the Eighth Amendment claim against Defendant Semple.

### b. PREA Director David McNeil

The evidence in the record suggests that Defendant David McNeil, the DOC PREA Director, was potentially personally involved only under the third *Colon* category ("created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom") or the fifth category ("failing to act on information indicating that unconstitutional acts were occurring"). *Colon*, 58 F.3d at 873. Ms. Tangreti argues that McNeil, like Semple, was "on actual notice of the [Davis] Building's deficiencies" regarding video monitoring. Opp'n, ECF No. 58 at 32. She also presents evidence that McNeil approved York's staffing plans and that he was aware of prior incidents of sexual misconduct at York. Like Semple, however, McNeil was not involved in supervising any of the COs who assaulted Ms. Tangreti, and there is no evidence that he was grossly negligent in his supervision of any DOC staff.

When he started as the DOC PREA Director in September 2013, McNeil visited all DOC

facilities, including York. McNeil Aff., ECF No. 48-10 ¶¶ 5, 21. He testified that he was aware

by "as early as October, 2013" that Davis needed additional cameras:

> Q: Were you aware prior to let's say January, 2014, were you aware of the need for video
> cameras in the Davis Building, to comply with PREA and the regulations?
> A: There – yes, there was a need for cameras. We assessed that soon after I got here in
> October of 2013.
> Q: Okay. So it was determined by you and your unit –
> A: Yes.
> Q: – as early as October, 2013, that the facility needed cameras?
> A: Yes.
> Q: And did not have them?
> A: Yes.

McNeil Dep., ECF No. 59-1 at 53–54; *see also id.* at 49 (agreeing that "the video monitoring at

least of [the basement, the laundry room, the first floor office, the shower, and the hallways

leading to those areas] in the Davis Building in 2014 was inadequate"). In February 2014,

McNeil's team applied for a federal grant to purchase additional cameras, *id.* at 54, but that grant

was not approved. McNeil Aff., ECF No. 48-10 ¶ 23. Ms. Tangreti has not presented evidence

that McNeil was involved in the camera plan proposal drafted by Lieutenant Andrews in

February 2014 and eventually signed by Commissioner Semple in August 2014.

There is also evidence that McNeil was involved in reviewing and approving York's

staffing plans. McNeil attests that he approved York's staffing plans effective December 6, 2013;

February 7, 2014; May 30, 2014; July 4, 2014; and September 12, 2014. McNeil Aff., ECF No.

48-10 ¶ 15. He explained in his deposition that he reviewed York's staffing plan to "make[] sure

that there's adequate – all the shifts are covered." McNeil Dep., ECF No. 59-1 at 50. "[P]rior to

2014," McNeil and others "determined that the staffing in [York] was adequate to meet the

requirements of the federal regs" and "adequate under the criteria listed in [28 C.F.R. § 115.13]."

*Id.* at 52–53. Ms. Tangreti argues that there is a dispute whether York had a staffing plan during

2014. She points to the State of Connecticut's response to a discovery request, ECF No. 59-2 at 50 ("There was no specific 'Staffing Plan' at York."), but the State later filed a supplemental response, stating that there *was* a staffing plan at York and citing McNeil's deposition testimony. 56(a)(1) Stmt., ECF No. 60 ¶ 60 n.3. Such a correction to a discovery response does not create a triable issue of fact. Ms. Tangreti also alleges that Andrews testified "there was no staffing plan consistent with the PREA requirements at the time that Ms. Tangreti was molested by the guards," Opp'n, ECF No. 58 at 9, but no such statement appears in the transcript filed on the docket, which appears to be the entire transcript of Andrews's deposition. *See* Andrews Dep., ECF No. 59-1 at 2–18.

Finally, McNeil had knowledge of other PREA-related incidents prior to Ms. Tangreti's report in October 2014. Specifically, McNeil had knowledge of one other complaint against CO Gillette, initiated on September 20, 2014, and two other complaints against CO Bromley, the first in 2013 and the second on October 2, 2014. McNeil Aff., ECF No. 48-10 ¶¶ 25, 27. He was also aware of a total of 27 PREA-related allegations that resulted in investigations against York staff from June 2010 to October 2014; 4 of those allegations were substantiated. *Id.* ¶ 28–29. None of these four substantiated allegations involved conduct of the type perpetrated against Ms. Tangreti—assaults occurring in less-traveled areas of a York building where there was no camera coverage. 56(a)(1) Stmt., ECF No. 60 ¶¶ 69–70. To the contrary, all four incidents involved either sexual communications between inmates and staff (by letter or phone) or a sexual relationship between a staff member and an inmate who had been released on parole.[7]

---

[7] As noted above, the documents show two additional substantiated allegations of sexual misconduct: a November 19, 2013 incident in which one inmate groped another inmate in the hallway of Davis, ECF No. 59-3 at 10–11, and a January 23, 2014 incident in which an inmate and a CO "engag[ed] in [s]exually harassing activities" within a "housing common area and cell" in a different York building, *id.* at 16–17. While the documents suggest these were both treated

Based on this evidence, no reasonable juror could find that McNeil violated Ms. Tangreti's Eighth Amendment rights. While McNeil had knowledge of York's staffing, Ms. Tangreti has not pointed to evidence that the staffing plan at York created a substantial risk of serious harm or was a causal factor in her sexual abuse, or that McNeil was deliberately indifferent to the risk of sexual abuse by staff when approving the staffing plan. And while McNeil had knowledge of prior incidents of sexual misconduct, Ms. Tangreti does not present evidence that he failed to respond adequately to those incidents. The 2013 complaint against Bromley was brought by a male inmate, alleged sexual harassment, and was unsubstantiated. *Id.* ¶ 27. The 2014 complaints against CO Gillette and CO Bromley, as discussed above, were brought too late to allow anyone to prevent those COs from abusing Ms. Tangreti. Finally, while McNeil did know, before January 2014, that Davis needed more cameras, Ms. Tangreti does not present evidence suggesting that McNeil failed to act on this information. The evidence in the record shows that he sought to remedy this deficiency four months after he learned of it during a tour of York by filing a federal grant application in February 2014. Since there is no evidence that McNeil was aware of any history of staff assaults or other staff misconduct against York inmates that might have been detected or prevented by better camera coverage[8], four months was not an unreasonable delay. And even if it was, no reasonable juror could find that McNeil's delay

as PREA incidents, Ms. Tangreti points to no evidence that McNeil knew of these prior incidents.

[8] Following the January 17, 2014 incident, involving allegations that an inmate had written sexual letters to a CO, a Facility Review prepared by York staff and dated March 12, 2014 noted that the inmate wrote the sexual letters "within a housing unit cell as the Officer was standing outside of it," and that there was "sufficient camera coverage which was instrumental in substantiating the Staff sexual misconduct." ECF No. 59-3 at 13. This Facility Review highlights the importance of cameras in the investigation of this incident of sexual misconduct, but there is no evidence McNeil was aware of it. In any event, McNeil had applied for the federal grant a month before this Review was prepared.

caused the harm Ms. Tangreti suffered; his grant proposal was rejected, and Ms. Tangreti offers

no argument or evidence suggesting it would have met a different fate had it been submitted

earlier. Nor does she point to any evidence that McNeil had authority to seek cameras for York

by other means; indeed, the evidence in the record suggests that the only other avenue to obtain

cameras was for the warden of the facility to request them, which is what happened here. *See*

*Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365 (S.D.N.Y. 2013) (in a §

1983 case for failure to prevent another inmate from stabbing plaintiff, finding that plaintiff did

not adequately allege personal involvement when the complaint "alleges that the defendants were

aware of the alleged security flaw, but fails to allege that any of the defendants had 'direct

responsibility' for ensuring those [security posts in the prison yard] were manned").

Therefore, to the extent McNeil was personally involved in requesting cameras or was

responsible for approving York's staffing plan or was aware of prior incidents of misconduct,

Ms. Tangreti has not shown that he failed to take reasonable measures to address the risk of

sexual assault, or that any such failures caused the harm she suffered. I grant summary judgment

with respect to the Eighth Amendment claim against Defendant McNeil.

### c. Warden Stephen Faucher

Based on Ms. Tangreti's allegations, Defendant Faucher, the Warden at York, was

potentially personally involved under the third *Colon* category ("created a policy or custom

under which unconstitutional practices occurred, or allowed the continuance of such a policy or

custom"), the fourth category ("was grossly negligent in supervising subordinates who

committed the wrongful acts"), or the fifth category ("failing to act on information indicating

that unconstitutional acts were occurring"). *Colon*, 58 F.3d at 873. Ms. Tangreti asserts that

Warden Faucher was aware of prior incidents of sexual misconduct at York, including by CO Gillette and CO Bromley, and that he was aware of inadequate video monitoring in Davis.

Specifically, she points to evidence that Faucher was aware of three[9] substantiated complaints of sexual misconduct and one[10] unsubstantiated complaint. First, an incident report was filed on November 19, 2013, describing an allegation that one inmate groped another in the hallway of Davis. Post-Investigation Facility Review, ECF No. 59-3 at 10. In the facility review following the incident, written on March 20, 2014, Lieutenant Andrews noted that "[t]here are no cameras currently in the building which, if in place, would serve as a deterrent to the inmate population," and that "[c]amera implementation would be beneficial as it would augment Staff tours as well as serve as a deterrent to the Inmate population for misconduct." *Id.* Despite these observations, Lieutenant Andrews did not recommend any improvement, and Warden Faucher signed the review on March 24, 2014. *Id.* at 10–11. As noted below, Warden Faucher had already asked Lieutenant Andrews to prepare a camera plan proposal by this point. Second, an incident was reported on January 17, 2014 involving allegations that an inmate had written sexual letters to a CO; the allegations were substantiated, and the CO was terminated. *Id.* at 13. Lieutenant Andrews noted that the incident occurred "within a housing unit cell as the Officer

_____

[9] As discussed above, there was also a substantiated incident on January 23, 2014 regarding "[s]exually harassing activities" between an inmate and a CO; the allegations were substantiated, and the CO was terminated. ECF No. 59-3 at 16. Lieutenant Andrews noted that there was "camera coverage" in the building where the incident occurred and did not make any recommendations. This review is not signed by Warden Faucher, and Ms. Tangreti points to no specific evidence that he was aware of this incident. Even if he was, however, my analysis would be the same.

[10] As discussed above, there was also an unsubstantiated complaint of sexual harassment against CO Bromley from June 2013. DOC PREA Investigation Unit Report, ECF No. 59-3 at 29. Again, Ms. Tangreti does not point to any specific evidence that Warden Faucher was aware of this incident, but if he was, my analysis would be the same.

was standing outside of it," and that there was "sufficient camera coverage which was instrumental in substantiating the Staff sexual misconduct." *Id.* He did not recommend any improvement, and Warden Faucher signed the review on March 13, 2014. *Id.* at 14. Third, an incident report was filed on September 20, 2014 when another inmate reported a sexual assault by CO Gillette; Faucher reviewed that report and signed it on September 22, 2014, forwarding it for investigation. Incident Report, ECF No. 59-3 at 6. Finally, Faucher was aware of the October 2, 2014 complaint against CO Bromley, alleging undue familiarity with an inmate. Faucher Aff., ECF No. 48-11 ¶ 15; Incident Report, ECF No. 59-3 at 24. CO Bromley was transferred to a male-inmates-only building at York pending the disposition of that investigation; the investigation was never completed, since CO Bromley was terminated following Ms. Tangreti's allegations. Faucher Aff., ECF No. 48-11 ¶ 15.

Ms. Tangreti also asserts that Warden Faucher knew the video monitoring in Davis was inadequate. The Facility Reviews mentioned above note the importance of cameras for documenting and deterring misconduct. Plus, Warden Faucher was familiar with the camera plan proposal. In his affidavit, he states that "[o]n January 29, 2014, [he] requested that [his] staff at York prepare a camera proposal for the installation of surveillance cameras at two York buildings: Shaw and Davis." Faucher Aff., ECF No. 48-11 at 6. The initial proposal, dated February 19, 2014, cites the DOC Administrative Directive 6.12 § 9(B), which provides that "[t]he use of video surveillance cameras shall be used to augment staff tours for increased observation. Each facility shall identify blind spots where sexual assaults are at higher risk of occurring and develop a strategy to compensate for such areas." Camera Plan Justification, ECF No. 59-2 at 59; DOC Administrative Directive 6.12, ECF No. 59-2 at 5. The proposal argues that "[t]he addition of camera coverage within the Units would increase the safety and security of the

Public, Staff, and Inmate populations as well as bring us into compliance with the standards of the Prison Rape Elimination Act (PREA)." ECF No. 59-2 at 59. The proposal specifically recommends a camera in the "staircase area leading to the recreation yard and basement," noting that "[t]he positioning identifies blind spots where sexual assaults are at higher risk of occurring" and that "these cameras would serve as a deterrent for, not only sexual assaults, but any misconduct." *Id.* at 60.

The initial proposal was drafted in February 2014 and modified in March 2014. 56(a)(1) Stmt., ECF No. 60 ¶¶ 24–25; Faucher Aff., ECF No. 48-11 ¶¶ 25, 27. Lieutenant Andrews prepared a supplemental proposal in May 2014, which was combined with the initial proposal; a York Engineer discussed implementation with a contractor in June 2014; and Faucher signed the camera project request on July 2, 2014. 56(a)(1) Stmt., ECF No. 60 ¶¶ 24–26; Faucher Aff., ECF No. 48-11 ¶¶ 27–30. After signing, he submitted the proposal "up the chain of command" to the District Administrator and then to the DOC central office "for approval and funding." 56(a)(1) Stmt., ECF No. 60 ¶ 26; Faucher Aff., ECF No. 48-11 ¶ 30.[11]

Ms. Tangreti also argues that Warden Faucher was responsible for the York staffing plan, but she does not present any evidence to support that assertion. She cites pages of the depositions of Lieutenant Andrews and Captain Smith that are not included in the record before the Court. *See* Opp'n, ECF No. 58 at 9 (citing Andrews Deposition); *id.* at 10 (citing Smith Deposition). In

---

[11] Captain Alex Smith testified that he helped Lieutenant Andrews prepare three proposals for cameras in Davis, sending them to Warden Faucher in the 6-12 months before October 31, 2014. Smith Dep., ECF No. 59-1 at 61–62. He testified that the Warden "would have then taken those requests and put them up to the central office;" Smith never learned what the response was to those requests. *Id.* at 62. Faucher testified that he does not "recall receiving any camera proposals from Captain Smith, independent of the proposal prepared by Lieutenant Andrews," Faucher Aff., ECF No. 48-11 ¶ 26, and Smith clarified in his affidavit that he "did not submit any proposals for video cameras to Warden Faucher, independent of the proposal(s) prepared by Lieutenant Andrews." Smith Aff., ECF No. 48-15 ¶ 8.

any event, as noted above with respect to Defendant McNeil, Ms. Tangreti points to no evidence that staffing at York was inadequate or that any such inadequacies caused the harm she suffered.

In light of this evidence of Warden Faucher's knowledge of prior incidents of sexual misconduct and his awareness that Davis needed more cameras, he arguably was aware of a substantial risk of serious harm from sexual misconduct at York. And the evidence suggests that he was personally involved because he "allowed the continuance of such a policy or custom" of limited camera coverage. *Colon*, 58 F.3d at 873. In *Qasem v. Toro*, the court found that plaintiff stated a claim under this third *Colon* category against a prison Superintendent and Deputy Superintendent by alleging that other inmates reported the CO's misconduct against the plaintiff, making the supervisors aware of "substantial evidence of [the CO's] misconduct;" nonetheless, the supervisors "failed to remove [the CO] from guarding [the plaintiff]" and "did not increase supervision of [the CO] despite their knowledge of allegations of [his] assaults and the [Inspector General's] investigation of him." 737 F. Supp. 2d at 152–53 (also denying qualified immunity based on the "numerous warning signs alleged, and the number of questionable—if not unintelligible—decisions made with respect to plaintiff during the course of the IG's investigation"). In *Pusepa v. Annucci*, the court similarly found that plaintiff stated a claim against prison supervisors, since they were aware of an acute problem of sexual abuse at the facility but nonetheless "allowed prolonged, unmonitored, one-on-one contact between male correction officers and female inmates in areas where sexual abuse was easily accomplished, failed to implement unpredictable supervisory rounds, and failed to enact policies to monitor and discipline staff who engaged in suspicious behavior with inmates." No. 17-CV-1765 (RA), 2019 WL 690678, at *8 (S.D.N.Y. Feb. 19, 2019).

Based on the reasoning in these cases, Ms. Tangreti has presented evidence to support the first element of Eighth Amendment liability under *Farmer* and the first part of the second element with respect to Warden Faucher, *i.e.*, his awareness of the risk. She has presented evidence showing that Warden Faucher knew that York needed additional cameras, that there were prior incidents of sexual assault at York, and that additional cameras would have reduced the risk of sexual assault incidents. A reasonable fact-finder could conclude, based on this evidence, that Warden Faucher was aware of a substantial risk of sexual assault against inmates, particularly in areas of the prison without cameras. Ms. Tangreti need not show that Warden Faucher was on notice specifically that COs Bromley, Gillette, and Dawson posed a danger of sexual assault. *Farmer*, 511 U.S. at 843 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific [offender] who eventually committed the assault.").

The question therefore becomes whether Warden Faucher "responded reasonably to the risk, even if the harm ultimately was not averted," *id.* at 844—specifically, whether he acted reasonably in pursuing the camera project at the pace he did when he knew that sexual assaults had occurred and that cameras would have helped prevent those assaults. Because the delay was substantially longer and his involvement substantially greater than in the case of Commissioner Semple or PREA Director McNeil, it is worth examining the law in more depth on the question of delay in this context. Some courts have recognized that delayed action—rather than failure to act—can give rise to an Eighth Amendment claim. *E.g.*, *Moore v. Good*, 7 F. App'x 2 (2d Cir. 2001) (finding that an 11-day delay by corrections officers in moving inmate to protective custody after he was assaulted would be sufficient to allege deliberate indifference to inmate

safety); *Woodyard v. Alabama Dep't of Corrections*, 700 F. App'x 927, 934 (11th Cir. 2017) ("Any reasonable officer should have known that he could not, in keeping with that standard [of taking reasonable measures to protect the safety of the inmates], delay for five minutes taking any action while one inmate assaulted another one.").

Most of the Eighth Amendment cases examining delay involve allegations of deliberate indifference in the provision of medical care. In that context, "[g]enerally, . . . the Second Circuit has reserved a finding of deliberate indifference for extreme cases." *Summerville v. Faciuna*, No. 05-CV-6459CJS, 2009 WL 2426021, at *7 (W.D.N.Y. Aug. 6, 2009) (citing *Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir.1990) (ignoring a life-threatening and fast-degenerating condition for three days); *Archer v. Dutcher*, 733 F.2d 14, 16–17 (2d Cir.1984) (delaying care as a form of punishment); *Hathaway v. Coughlin*, 841 F.2d 48, 50–51 (2d Cir.1988) (delaying major surgery for over two years)). In *Smith v. Carpenter*, the Second Circuit instructed: "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." 316 F.3d 178, 185 (2d Cir. 2003). The Seventh Circuit expressed similar reasoning, since "prisons have limited resources, and that fact makes some delay inevitable. For a delay in treatment to qualify as deliberate indifference, we must weigh the seriousness of the condition and the ease of providing treatment." *Mitchell v. Kallas*, 895 F.3d 492, 500 (7th Cir. 2018) (internal citations omitted) (also finding qualified immunity since "[t]here is little evidence about the typical length" of the medical process in question, and the

defendant "was not on notice that a 13-month evaluation [for the appropriateness of hormone therapy] would violate [the plaintiff's] Eighth Amendment right").

Although they arise in a different context, these cases offer general lessons about the level of responsiveness to inmate well-being the Eighth Amendment requires of prison officials. Here, these cases suggest that whether Faucher "responded reasonably to the risk" depends on the length of the delay in light of the imminence and seriousness of the risk of harm and in light of the time and resources needed to reduce the risk of harm, *i.e.*, to procure cameras. I conclude that Ms. Tangreti has failed to show that any delay in the camera project was unreasonable under the circumstances. Warden Faucher was aware of only one[12] prior incident of sexual misconduct that cameras might have deterred—*i.e.*, the November 19, 2013 incident where one inmate groped another in a Davis hallway—and there is no evidence he knew of the need for cameras suggested by that incident until March 24, 2014, the date of his signature on the Facility Review. ECF No. 59-3 at 11. Further, while Lieutenant Andrews thought that cameras would have helped deter inmate misconduct in the November 2013 incident, York was able to detect and investigate the misconduct without cameras. Two months after that incident—though not "in response to a particular incident or incident(s)"—Warden Faucher initiated the camera proposal project on January 29, 2014, and signed it on July 2, 2014; in other words, by the time he was informed in March 2014 of the need for cameras arising from the November 2013 incident, he had already launched the process to procure them. Faucher Aff., ECF No. 48-11 ¶ 22–23, 30. Warden

_____

[12] The Facility Review for the January 17, 2014 incident, involving sexual correspondence between an inmate and a CO, did note that there was "sufficient camera coverage which was instrumental in substantiating the Staff sexual misconduct." ECF No. 59-3 at 13. While this incident arguably put Warden Faucher on notice of the importance of cameras generally, the misconduct at issue was quite different from the eventual sexual assaults against Ms. Tangreti. In addition, by the time Warden Faucher signed this document on March 13, 2014, the camera project he had initiated was well underway.

Faucher did not learn of any new incidents of sexual misconduct until September 20, 2014. Faucher Aff., ECF No. 48-11 ¶ 22–23, 30.

Based on this evidence, it was reasonable for Faucher to believe, between February and September 2014, that the camera project was a "priority" but not an "emergency request." Faucher Aff., ECF No. 48-11 ¶ 22. Ms. Tangreti has offered no evidence of how long it ordinarily takes for facility project requests involving substantial expense to move through York or through the DOC system. Here, in response to Warden Faucher's request, Lieutenant Andrews prepared the proposal for cameras for two York buildings—Shaw and Davis—on February 19, 2014; the proposal was reviewed by and received input from a York engineer; and the proposal was expanded to include two additional York buildings on May 9, 2014, and ultimately carried an estimated cost of $450,000. 56(a)(1) Stmt., ECF No. 60 ¶¶ 20–21, 24–27, 41. Once he submitted the camera project request "up the chain of command" after signing it on July 2, 2014, Faucher was not involved in the approval and funding process. *Id.* ¶¶ 26–27. Ms. Tangreti has failed to show that this sequence of events constituted an unreasonable delay by Faucher.

Ms. Tangreti has also failed to show that any delay by Faucher in initiating and approving the camera plan proposal was a causal factor in her injuries. As discussed above regarding Commissioner Semple's involvement, Warden Faucher's was far from the final signature needed on this request for $450,000 in state funds, and state budgetary shortfalls at a level several links higher in the "chain of command"—and outside the DOC altogether—ultimately delayed the project by five months, such that the cameras were not installed until late April 2015. *Id.* ¶¶ 49–51. There is no evidence that cameras would have been installed more quickly had Warden Faucher approved the proposal earlier than he did.

In light of what Faucher knew about incidents of sexual misconduct at York and about the role of cameras in preventing that misconduct, Ms. Tangreti has not shown that he acted unreasonably in steadily but not urgently pursuing a $450,000 project request or that his actions caused the harm she suffered. In any event, there is no clearly established law in this Circuit obligating prison wardens to pursue necessary but expensive facility projects at a particular pace or with a particular degree of urgency. Warden Faucher, therefore, was not on notice that his actions in initiating and approving the camera project proposal from January 29 to July 2, 2014, would violate any inmates' Eighth Amendment rights. *See Kallas*, 895 F.3d at 500. Moreover, "officers of reasonable competence could disagree" as to whether the Warden responded reasonably to the risk of sexual assault in pursuing the camera project. *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007). For these reasons, qualified immunity would apply even if Ms. Tangreti had presented sufficient evidence to show that Warden Faucher failed to respond reasonably to the risk. Therefore, I grant the motion for summary judgment on the § 1983 claim against Defendant Faucher.

### d. Deputy Warden Stephen Bates

Ms. Tangreti asserts that Deputy Warden Bates also knew about at least some of the prior incidents of sexual assault and that he was involved in at least the early stages of the camera project proposal. As the PREA Coordinator at York, Bates was also responsible for "ensur[ing] that . . . staffing levels were maintained." 56(a)(1) Stmt., ECF No. 60 ¶ 105. Bates was therefore conceivably personally involved under the third *Colon* category ("created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom"), or the fifth category ("failing to act on information indicating that unconstitutional acts were occurring"). *Colon*, 58 F.3d at 873. Given his role as York PREA Coordinator, the fourth

category ("was grossly negligent in supervising subordinates who committed the wrongful acts") could apply, but Ms. Tangreti has not presented any specific evidence regarding his supervision of the COs who assaulted her, the adequacy of PREA training at York, or the adequacy of York's staffing.

Ms. Tangreti has presented evidence that Bates was aware of the November 19, 2013 incident involving an allegation that one inmate groped another in the hallway of Davis. Post-Investigation Facility Review, ECF No. 59-3 at 10. Like Warden Faucher, Deputy Warden Bates signed the facility review of that incident on March 20, 2014. Bates also signed the facility review following the January 17, 2014 incident involving allegations that an inmate had written sexual letters to a CO. *Id.* at 14. Finally, Bates was aware of the report filed on September 20, 2014 alleging that CO Gillette had assaulted an inmate in July 2014. Incident Report, ECF No. 59-3 at 6 (noting that Bates was the Duty Officer the night the report was filed and was notified at 9:40 PM). Bates was also involved in preparing the February 2014 camera proposal but was not involved in the approval process after that point. Bates Aff., ECF No. 48-4 ¶¶ 8–9; 56(a)(1) Stmt., ECF No. 60 ¶¶ 106–07.

This evidence does not suffice to support a finding that Deputy Warden Bates was personally involved under any *Colon* category. While he helped prepare the camera proposal in February 2014, there is no evidence that Bates created York's camera policy, was responsible for maintaining it, or had authority to take any actions regarding cameras other than helping with the proposal. He did not have any role in the project after February 2014. 56(a)(1) Stmt., ECF No. 60 ¶ 107; *see Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365 (S.D.N.Y. 2013) (finding that supervisory liability under § 1983 requires "allegations that the defendants had direct responsibility for monitoring the alleged violation"). And though Bates was aware of

some prior incidents of sexual misconduct, Ms. Tangreti does not present evidence that he failed to respond reasonably to those incidents. For these reasons, I grant summary judgment as to the § 1983 claim against Defendant Bates.

### e. Lieutenant Douglas Andrews

Ms. Tangreti's allegations against Lieutenant Andrews are largely the same as against Bates—that Andrews knew of prior incidents of sexual assaults, knew that cameras were recommended following those incidents, and prepared the camera proposal in 2014. Thus, like Bates, Andrews was conceivably personally involved under the third *Colon* category ("created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom"), or the fifth category ("failing to act on information indicating that unconstitutional acts were occurring"). *Colon*, 58 F.3d at 873. Ms. Tangreti does not present evidence that Andrews was responsible for supervising the COs who assaulted her or that he was deficient in his supervision of any other staff.

Lieutenant Andrews was aware of many of the prior incidents of sexual misconduct. Lieutenant Andrews recalled a 2005 incident "involving a correctional officer allegedly licking an inmate's breast. . . . That officer was fired and arrested." Andrews Aff., ECF No. 48-8 ¶ 9. He recalled that "CO Bromley was the subject of a prior PREA-related complaint brought by a male inmate," but did not "know how that matter was resolved." *Id.* ¶ 12; *see also* DOC PREA Investigation Unit Report, ECF No. 59-3 at 29. He was aware of the November 19, 2013 incident involving an allegation that one inmate groped another in the hallway of Davis. Post-Investigation Facility Review, ECF No. 59-3 at 10. Lieutenant Andrews prepared the facility review of that incident, suggesting camera implementation, on March 20, 2014. *Id.* He was also aware of the January 17, 2014 incident involving allegations that an inmate had written sexual

letters to a CO, and he wrote the facility review on March 12, 2014. *Id.* at 14. He knew of a January 23, 2014 incident involving substantiated allegations that a CO sexually harassed an inmate; he wrote the facility review (which is not signed by Bates or Faucher) on August 25, 2014, and did not recommend any improvements. *Id.* at 16–17. He knew about the report filed on September 20, 2014 alleging that CO Gillette had assaulted an inmate in July 2014. Incident Report, ECF No. 59-3 at 8 (noting that "[a] copy of this report will be forwarded to Lt. Douglas Andrews"). There is no evidence that he knew about the October 2, 2014 allegation regarding CO Bromley. Lieutenant Andrews also authored the February 2014 camera proposal, but he "had no further involvement in the process" after that point. 56(a)(1) Stmt., ECF No. 60 ¶ 83.

As with Deputy Warden Bates, this evidence does not suffice to show that Lieutenant Andrews was personally involved in creating or maintaining York's policy regarding cameras or that he failed to respond reasonably to the incidents of sexual misconduct. At Warden Faucher's direction, Lieutenant Andrews prepared a camera proposal in February 2014; there is no evidence he had the responsibility or the authority to take any other steps to obtain cameras for Davis. Similarly, Ms. Tangreti does not present any evidence that he failed to respond reasonably to the prior incidents of sexual misconduct. In the post-investigation facility reviews he authored, he noted when cameras were useful in the investigation and when cameras would have been helpful in deterring misconduct, and all of those facility reviews are dated after he had already drafted the initial camera proposal at Warden Faucher's request. Again, there is no evidence that he had the responsibility or the authority to take any further steps. *See Parris*, 947 F. Supp. 2d at 365 (requiring "allegations that the defendants had direct responsibility for monitoring the

alleged violation"). Therefore, I grant summary judgment as to the § 1983 claim against

Defendant Andrews.[13]

### f. Lieutenant Modikiah Johnson

In her First Amended Complaint, Ms. Tangreti alleges that Lieutenant Johnson "sexually

harassed" her by "repeatedly ask[ing] for personal details about her life, including information

---

[13] Ms. Tangreti suggests that the Defendants should be liable for alleged noncompliance with PREA standards. *See* Opp'n, ECF No. 58 at 4 (arguing that "every one of the defendants is responsible for PREA compliance"); *id.* at 12 ("As a result of these multiple and longstanding failures to comply with federal and agency rape-prevention mandates," Ms. Tangreti was raped and sexually abused at York.). The PREA does not create a private cause of action. *Granger v. Santiago*, No. 3:19CV60 (MPS), 2019 WL 1644237, at *7 (D. Conn. Apr. 16, 2019) (noting that "district courts have routinely held that there is no private right of action for inmates to sue prison officials for non-compliance with the PREA" and collecting cases). While PREA standards may be relevant to a defendant's awareness of the risk of sexual assault and to the reasonableness of a defendant's response under the Eighth Amendment, those standards do not address the key questions here, including whether Semple, Faucher, and others unreasonably delayed procuring cameras.

Contrary to Ms. Tangreti's assertions, PREA does not mandate the installation of cameras in all cases. Rather, the implementing regulations require facilities to "develop, document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse" taking into consideration factors such as the prevalence of incidents of sexual abuse and the facility's physical layout. 28 C.F.R. § 115.13(a)(5). DOC Administrative Directive 6.12 also instructs that "video surveillance cameras shall be used to augment staff tours for increased observation. Each facility shall identify blind spots where sexual assaults are at higher risk of occurring and develop a strategy to compensate for such areas." ECF No. 59-2 at 5. These regulations require facilities to assess the need for cameras, in the context of staffing and other factors, and to "make [their] best efforts" and "develop a strategy" to prevent sexual abuse. They do not require facilities to install any particular number of cameras and they do not specify any particular timeline.

The evidence presented in this case suggests that York and DOC staff were "develop[ing] a strategy" to improve video monitoring and were making real efforts to procure additional cameras. McNeil toured York in October 2013 and assessed the need for cameras, in compliance with 28 C.F.R. § 115.13(c) (requiring that, at least once a year, "the agency shall assess, determine and document whether adjustments are needed to . . . . [t]he facility's deployment of video monitoring systems"); he then helped prepare a federal grant request seeking funding for cameras in 2014; Warden Faucher initiated a process to request cameras in January 2014; and Andrews made suggestions in facility reviews regarding the usefulness of cameras in deterring sexual misconduct. In short, Ms. Tangreti's assertions regarding alleged violations of the PREA do not change the Eighth Amendment analysis in this case.

that would allow him to find her when she was released from prison, comment[ing] on her body, and t[elling] her that he wanted to take care of her when she got out." ECF No. 37-1 ¶ 109. She also notes that he was "one of the supervisors responsible for touring the Davis Building and ensuring [her] safety and the safety of the other female inmates, and was one of the supervisors responsible for accepting and acting on sexual harassment complaints." *Id.* ¶ 110. In her summary judgment papers, Ms. Tangreti does not mention these allegations of sexual harassment against Lieutenant Johnson, and she only alludes generally to Johnson's responsibility to ensure PREA compliance at York. Opp'n, ECF No. 58 at 3. In her deposition, Ms. Tangreti testified that she did not feel comfortable reporting her sexual abuse to Lieutenant Johnson when he toured Davis since he "would make comments about me in front of me multiple times," would "make a kissy face at me or make a comment," and was "hitting on [her] and offering his number." Tangreti Dep., ECF No. 48-16 at 86–87.

It is not clear whether Ms. Tangreti is arguing that Lieutenant Johnson violated her Eighth Amendment rights through his sexual harassment or through his failure to prevent her sexual abuse by COs Bromley, Gillette, and Dawson. If she is arguing that he is directly liable for the alleged sexual harassment, the Defendants correctly note that her allegations do not constitute a cognizable Eighth Amendment claim. The Second Circuit has found that allegations of more severe sexual harassment, without any physical contact, do not state a claim under the Eighth Amendment. *Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002), *abrogated on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002) (finding that plaintiff did not "state a claim for sexual harassment in violation of the Eighth Amendment" by alleging that a prison staff member "repeatedly demanded that [plaintiff] have sex with her and that he masturbate in front of her"); *see also Braswell v. Cmty. Sols., Inc.*, No. 3:11-CV-01043 JCH, 2014 WL 4749074, at *4 (D.

Conn. Sept. 23, 2014) ("Where a prisoner alleges sexual harassment, but does not allege any physical contact, courts have rejected claims that such sexual harassment amounts to an Eighth Amendment violation.").

If Ms. Tangreti is arguing for supervisory liability, she has not shown that Lieutenant Johnson was personally involved under any of the *Colon* categories: she has not shown that he knew of any prior incidents of sexual misconduct, nor that he was involved in the camera proposal project, 56(a)(1) Stmt., ECF No. 60 ¶ 98, nor that he was grossly negligent in supervising the four COs who assaulted or abused her. Because Ms. Tangreti presents no evidence to support his liability under § 1983, I grant summary judgment as to the claims against Lieutenant Johnson.

### g. Counselor Christine Bachmann

Finally, Ms. Tangreti argues that Counselor Bachmann is "the most culpable of the group," based on her observations of CO Bromley, Ms. Tangreti, and their interaction. Opp'n, ECF No. 58 at 32. Ms. Bachmann was conceivably personally involved in the violations against Ms. Tangreti under fourth *Colon* category ("was grossly negligent in supervising subordinates who committed the wrongful acts") or the fifth category ("failing to act on information indicating that unconstitutional acts were occurring"). *Colon*, 58 F.3d at 873. While Counselor Bachmann was aware that Davis needed cameras, and told the York Warden and Deputy Warden as much, there is no evidence she was involved in the proposal process or had any responsibility for York's camera policy.

Counselor Bachmann and CO Bromley "both had offices on the first floor of Davis and she had considerable interaction with him." 56(a)(1) Stmt., ECF No. 60 ¶ 127. At one time, she saw Ms. Tangreti "lingering at the doorway" of CO Bromley's office, talking with him. 56(a)(1)

Stmt., ECF No. 60 ¶ 130; Bachmann Dep., ECF No. 59-1 at 24. On another, later occasion, she observed an "inappropriate conversation" between CO Bromley and Ms. Tangreti in the laundry room, where "they were talking about other staff members." 56(a)(1) Stmt., ECF No. 60 ¶ 129; Bachmann Dep., ECF No. 59-1 at 23–24. In response, she spoke to CO Bromley, telling him that the discussion suggested "undue familiarity" and "would be of concern." Bachmann Dep., ECF No. 59-1 at 27. She also testified that she discussed the incident with Captain Smith, *id.* at 28, but she did not take any other steps in response to the incident because she "did not consider this to be a serious incident," Bachmann Aff. ECF No. 48-6 ¶ 8. She did not recall exactly when this incident occurred but estimated that it was "[c]loser to October" 2014 than to February 2014. Bachmann Dep., ECF No. 59-1 at 23–24.

The DOC Investigative Office interviewed Counselor Bachmann in July 2015. In the interview, Bachmann reported that she had "seen some questionable behavior with Bromley in the past," including "him being too close to the inmates, and having the inmates in the office when they have no reason to be," and that "he was always walking the line of inappropriateness." DOC Security Division Report, ECF No. 59-2 at 126. She also indicated that "Tangreti was around [CO Bromley] an awful lot, and other inmates report[ed] this and that," suggesting she had perhaps heard rumors regarding Ms. Tangreti and CO Bromley. Indeed she told her interviewer that she "g[o]t complaints from the other inmates about . . . Tangreti being in the office with him in the morning, before she got in." *Id.* Other inmates in Davis were interviewed on October 31, 2014 or in the following few days and stated that Ms. Tangreti "was constantly in the officer's station," and that Ms. Tangreti and CO Bromley were "always together. She is standing right behind him before he goes into the office at the beginning of the shift." *Id.* at 136.

Counselor Bachmann also told the interviewer that Ms. Tangreti "was heavily flirtatious with everybody" and "staff were trying to work with [her] to change some of that because she was completely identified by her outward appearance." *Id.* at 129. She also said she noticed a change in Ms. Tangreti's behavior and physical experience in the time leading up to October 31, 2014: Ms. Tangreti was "presenting as anxious" and was "more wrapped up in being out of prison than in the programming, and that she seemed obsessed about it." *Id.* at 129–30. During that time period, Ms. Tangreti was also "in [Counselor Bachmann's] office frequently, and she was reporting she was very emotional, crying all the time and she didn't know why." *Id.* Ms. Tangreti was "not getting up, or wearing makeup on a regular basis, and she had definitely gained weight, but not a huge amount." *Id.* It is not clear precisely when Counselor Bachmann began noticing these changes.

Ms. Tangreti also presented evidence that Counselor Bachmann knew of at least one prior incident of sexual assault in Davis: the November 19, 2013 assault between two inmates. Post-Investigation Facility Review, ECF No. 59-3 at 10 ("CS Bachmann followed PREA protocol once [the inmate] informed her of the allegation."). Counselor Bachmann also testified that she had made requests for cameras in Davis, that she "had many reports . . . [n]oting that there were no cameras" and "a number of conversations . . . with Wardens, Deputy Wardens" discussing the need for cameras. Bachmann Dep., ECF No. 59-1 at 30.[14]

_____

[14] Counselor Bachmann testified at her deposition that she noted the need for cameras in incident reports, including "easily three, four" incident reports prior to February 2014 related to PREA investigations. *Id.* at 31–32. In her Affidavit, however, she revised this deposition testimony:

> When giving a deposition, I stated that I had previously written PREA related incident reports, in which I had noted the lack of cameras in Davis. . . . Following the deposition, I thoroughly researched my incident reports, which I maintain on a drive on my computer. As a result of my search, I determined that there were, in fact, no such reports."

Bachmann Aff., ECF No. 48-6 ¶ 17.

Based on this evidence, Ms. Tangreti argues that Counselor Bachmann knew about CO Bromley's "undue familiarity with the plaintiff" and that she therefore had a "mandatory duty to intervene." Opp'n, ECF No. 58 at 30–31. Drawing all reasonable inferences in favor of Ms. Tangreti, I find that there is sufficient evidence that Counselor Bachmann was aware of a substantial risk of sexual assault, generally in Davis, specifically by CO Bromley, and specifically against Ms. Tangreti. She was aware, from prior PREA investigations, that the absence of cameras in Davis presented some risk of sexual assault, and she knew that there was undue familiarity, along with frequent interaction and proximity, between Ms. Tangreti and CO Bromley. She heard rumors that Ms. Tangreti was in CO Bromley's office in the mornings, before she arrived at work. The statements of other inmates that Ms. Tangreti was "constantly" in CO Bromley's office permit a reasonable inference that the risk of undue familiarity was obvious, which is circumstantial evidence that Bachmann—the only one of the Defendants whose office was located in Davis—knew of the risk. *See Farmer*, 511 U.S. at 842 (permitting "inference from circumstantial evidence" in proving knowledge and noting that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

As with most of the other Defendants, the question is therefore whether she "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. DOC Administrative Directives prohibit "undue familiarity" and require staff to "focus on identifying potential signs of victimization and intervene before the incident occurs." Opp'n, ECF No. 58 at 31 (citing ECF Nos. 59-2 at 14, 4). Commissioner Semple testified at his deposition that he "would have documented" the conversation in the laundry room, and he agreed that Counselor Bachmann "had a duty to document what she heard." Semple Dep., ECF

No. 59-1 at 139. Counselor Bachmann testified in her deposition that she told Captain Smith about that conversation, but there is no evidence what Captain Smith did upon receiving that information. There is also no evidence that Ms. Bachmann documented her observation, initiated PREA protocol, or made any formal report. Based on Commissioner Semple's testimony, and drawing all reasonable inferences in favor of Ms. Tangreti, a reasonable juror could conclude that Ms. Bachmann failed to respond reasonably to her observations of inappropriate interaction between CO Bromley and Ms. Tangreti and her knowledge of the risk of sexual abuse.

A reasonable juror could also conclude that there is an "affirmative causal link" between Ms. Bachmann's failure to report the conversation she witnessed in the laundry room and the sexual abuse of Ms. Tangreti. *Poe*, 282 F.3d at 140. Ms. Bachmann could not remember when this incident occurred, but Ms. Tangreti testified that CO Bromley's sexual abuse continued until he was reassigned to a different building on October 2, 2014. Tangreti Dep., ECF No. 48-16 *Id.* at 92–93 ("[I]f he was in the building, this was happening to me."). Construing the record in the light most favorable to Ms. Tangreti, therefore, a reasonable juror could infer that CO Bromley engaged in further sexual abuse of Ms. Tangreti following the incident Ms. Bachmann observed. Commissioner Semple testified that, had Counselor Bachmann documented the incident, she would have submitted it to a Lieutenant, who would "write a supervisor review" and then submit it "through the chain of command. And then a determination would be made if an investigation was going to occur." Semple Dep., ECF No. 59-1 at 139–40. Semple then testified further as to the likely result, had Counselor Bachmann documented the incident:

> Q: Do you agree with me that if Bachman[n] had made the report you just talked about, the investigations that you just had identified, one or more of them were conducted, do you agree more likely than not Bromley would not have continued to assault Cara after that time?
> A: I don't know how to answer that without giving you my impression of what I think would have happened if a formal investigation of some sort commenced. More likely

> than not, the officer in question would have been separated from the inmate who is also involved in the incident.

*Id.* at 141. Again, drawing inferences in Ms. Tangreti's favor, a reasonable juror could conclude from Semple's testimony that CO Bromley likely would have been separated from Ms. Tangreti—thereby stopping the abuse—had Counselor Bachmann documented the incident she observed. Because there is evidence of an affirmative causal link between Counselor Bachmann's failure to document her observations and the continued abuse of Ms. Tangreti, Ms. Tangeti has raised a genuine dispute as to Bachmann's liability under § 1983.

I also find that Counselor Bachmann is not entitled to qualified immunity at this stage of the litigation. The law in the Second Circuit at the time clearly established that prison inmates had a constitutional right to be protected from sexual abuse, *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (finding that "allegations of sexual abuse" could state an Eighth Amendment claim), and that prison supervisors could be liable under § 1983 for "gross[] negligen[ce]" in supervising subordinates" or for "failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. In *Cash v. County of Erie*, the plaintiff brought a due process claim under § 1983 against the County and its policymaker for sexual assault she suffered while held in pretrial confinement. 654 F.3d 324, 327 (2d Cir. 2011). Applying a "deliberate indifference" standard that the Second Circuit noted was "parallel" to the Eighth Amendment context for sentenced inmates, the court found that the plaintiff "adduced sufficient evidence of municipal liability" on her § 1983 claim because the jury reasonably could have found that policymakers knew the "risk of sexual abuse by male guards," that they knew the current policy was "insufficient to deter such conduct," and that the lack of "proactive steps to minimize the opportunity for [sexual] exploitation . . . demonstrated deliberate indifference to defendants' affirmative duty to protect prisoners from sexual exploitation." *Cash*, 654 F.3d at

339. Counselor Bachmann was on notice that, in her supervisory role at York, she could be held liable for failing to respond reasonably to a known substantial risk of sexual abuse.

When the law is clearly established, a defendant is "entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001). In this case, construing all facts in Ms. Tangreti's favor, Commissioner Semple's testimony suggests that Counselor Bachmann's failure to report the conversation she overheard—particularly in light of her knowledge of other risk indicators—was objectively unreasonable, and that any officer of reasonable competence would have recognized she "had a duty to document what she heard." Semple Dep., ECF No. 59-1 at 139. Therefore, I find that Counselor Bachmann is not entitled to qualified immunity based on the summary judgment record, and I deny the motion for summary judgment as to the § 1983 claim against her.

## B. State Law Claims

Ms. Tangreti's First Amended Complaint states claims for recklessness (Count Two) and intentional infliction of emotional distress ("IIED") (Count Three). The Defendants move for summary judgment on these state law claims as well, but they make only a cursory argument in their brief. They assert only that "the uncontroverted evidence demonstrates that the defendants did not act inappropriately, in any manner (let alone recklessly or egregiously)" and that the Court should decline to exercise supplemental jurisdiction over the state law claims if the constitutional claims are dismissed. Defs.' Mem., ECF No. 54-1 at 40. Ms. Tangreti does not discuss the adequacy of her state law claims at all in her Opposition.

Because I denied summary judgment as to the constitutional claim against Defendant Bachmann, this Court retains subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343. The Court therefore also retains supplemental jurisdiction over Ms. Tangreti's state law claims, since they arise from a "common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). For the reasons discussed below, I grant summary judgment on the IIED claims against six Defendants because Ms. Tangreti did not allege or present evidence supporting a claim of affirmative misconduct. However, Ms. Tangreti's allegations and the evidence could conceivably support an IIED claim against Defendant Johnson and a recklessness claim against all Defendants; therefore, in the absence of any specific briefing on these claims, I deny summary judgment as to them.

### 1. Intentional Infliction of Emotional Distress (Count Three)

Though the parties did not adequately brief this claim, the allegations in Ms. Tangreti's First Amended Complaint and the evidence in the record make clear that she has not produced evidence to support a claim of intentional infliction of emotional distress ("IIED") against Defendants Semple, McNeil, Faucher, Bates, Andrews, or Bachmann. To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011). "Failure to act is not *affirmative* misconduct. Connecticut courts have held that a failure to act does not rise to the level of 'extreme and outrageous behavior'" required for IIED liability. *Johnson v. Maurer*, No. 3:18-CV-694 (CSH), 2018 WL 6421059, at *18 (D. Conn. Dec. 6, 2018); *see*

*Williams v. Cmty. Sols., Inc*., 932 F. Supp. 2d 323, 337 (D. Conn. 2013) ("Connecticut courts have been unwilling to hold defendants liable [on an IIED claim] for nonfeasance or failure to intercede, even where those defendants knew that misfeasance or harm was occurring or was likely to occur." (internal quotation marks omitted; citing cases)); *Giard v. Town of Putnam*, No. CV085002754S, 2008 WL 5481273, at *10–11 (Conn. Super. Dec. 3, 2008) (finding no intentional infliction of emotional distress when defendant guidance counselor failed to stop student's suicide, despite student's announcement he was going to kill himself). Ms. Tangreti has not alleged any affirmative misconduct by these six defendants, only that they failed to respond reasonably to the risk of sexual assault. Therefore, because even Ms. Tangreti's allegations would not support a finding of IIED with respect to these defendants, I grant summary judgment on the IIED claim against these six defendants.

As to the IIED claim against Defendant Johnson, I deny summary judgment. "[C]onduct amounting to sexual harassment may give rise to a claim for intentional infliction of emotional distress," and the relevant question is "whether the conduct alleged to underlie the sexual harassment . . . is itself extreme and outrageous." *Kilduff v. Cosential, Inc.*, 289 F. Supp. 2d 12, 22 (D. Conn. 2003) (finding plaintiff's allegations that her supervisor "used sexual analogies . . . , subjected her to sexist language over an extended period of time," occasionally "engaged in inappropriate touching," and "stated that he would discharge her if she cut her hair" stated a claim for IIED). Ms. Tangreti makes allegations of sexual harassment by Defendant Johnson in her First Amended Complaint, but the parties have not briefed whether there are genuine disputes of material fact as to this claim. As it is Defendants' burden to show a lack of a genuine dispute of fact regarding her claims, I deny summary judgment on the IIED claim against Defendant Johnson.

*2.* **Recklessness (Count Two)**

I also deny summary judgment as to Ms. Tangreti's recklessness claim against all Defendants because the evidence could conceivably support a claim, and the parties have not briefed the issue. In Connecticut, "[r]ecklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent." *Doe v. Hartford Roman Catholic Diocesan Corp.*, 119 A.3d 462, 483 (Conn. 2015). Reckless conduct "tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.* The standard of liability for common-law recklessness differs from the *Farmer* standard for deliberate indifference, and Defendants have not shown that there is no dispute of material fact on this claim. *See Doe v. Boy Scouts of Am. Corp.*, 147 A.3d 104, 121 (Conn. 2016) (denying summary judgment on plaintiff's recklessness claim since "reasonable minds could disagree as to whether the risk of sexual abuse was sufficiently great such that the defendant either knew or should have known that its failure to take [] precautions [to prevent sexual abuse] would expose Boy Scout participants to a great risk of harm"). Since recklessness liability can attach to a failure to take precautions, and because she has presented evidence to support that Defendants knew of the risk of sexual assault at York, Ms. Tangreti has conceivably stated a recklessness claim against all Defendants. In the absence of any specific briefing, therefore, I deny summary judgment on this claim.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is DENIED as to the intentional infliction of emotional distress claim against Defendant Johnson, DENIED as to the recklessness claim against all Defendants, and DENIED as to the Eighth Amendment claim against Defendant Bachmann. On all other claims, the motion for summary judgment is GRANTED and those claims are DISMISSED with prejudice.

Because the motion for summary judgment is denied in part, the Court sets jury selection for September 2, 2020. The parties shall submit a joint trial memorandum by July 17, 2020. The Court will hold a pretrial conference on August 21, 2020 at 10:00 AM. The parties are reminded that they may file a joint statement requesting referral for mediation, in accordance with the undersigned's instructions available on the Court's website.


IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              October 8, 2019